# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 19, 2012

Lyle W. Cayce
Clerk

No. 11-50255

ANDREW AMSEL,

Plaintiff-Appellant Cross-Appellee

v.

THE TEXAS WATER DEVELOPMENT BOARD; MELANIE CALLAHAN, Successor, In Her Official Capacity as the Executive Administrator of the Texas Water Development Board,

Defendants-Appellees Cross-Appellants

Appeals from the United States District Court
for the Western District of Texas
USDC No. 1:09-CV-389

Before KING, WIENER, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Andrew Amsel ("Amsel") appeals from the district court's grant of summary judgment in favor of the Texas Water Development Board, and Melanie Callahan in her official capacity (collectively, "TWDB"). Amsel sued for disability discrimination under Title I of the Americans with Disabilities Act ("ADA") and Rehabilitation Act, for age discrimination under the Age Discrimination in Employment Act, and for retaliation under the Family and

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Medical Leave Act ("FMLA").  Amsel appeals only the judgment relative to his disability and FMLA retaliation claims.  For the following reasons, we AFFIRM.

## I.  FACTS AND PROCEDURAL BACKGROUND

TWDB is a state agency that provides water planning, financial and technical assistance, and data collection for the State of Texas.  Amsel worked in various positions there from May 1997 until his termination in August 2007.  During his tenure, Amsel suffered from several medical conditions including ischemic heart disease, functional class IV angina, and a major digestive disorder.  From 1997 to 2005, Amsel worked in TWDB's information technology group as a Systems Analyst.  There, he was provided significant telecommuting accommodations designed to allow him to work despite his health difficulties.

Amsel's conditions stem from a 1992 quadruple coronary bypass and cancer in 1993.  As a result of these health conditions, Amsel's ability to walk, bend, and engage in daily tasks is significantly limited.  Amsel's heart problems also cause severe chest pain and shortness of breath.  The cancer also necessitated removal of Amsel's esophagus and relocation to his chest, resulting in poor gastric emptying and several other related symptoms including nausea, indigestion, vomiting, reflux, and a dumping reflex.  Amsel testified that he is thus rendered homebound until these symptoms are "stabilized."

### *Changing Positions*

In August 2004, Amsel's position was identified as one of four in the IT department facing a threat of outsourcing.  As a result of the additional stress this caused, Amsel sought treatment from his primary care physician, Dr. Ace Alsup, who recommended that Amsel be provided a job with reduced stress and a flexible work schedule that would allow him to continue telecommuting.

Amsel met with then Human Resources Director Robert Ruiz ("Ruiz") about Dr. Alsup's recommendation.  In turn, Ruiz approached Lisa Glenn

("Glenn"), then director of Administration at TWDB, about creating a new position for Amsel. Glenn determined that Amsel qualified to fill a back-up role to a TWDB employee in another department.

In a memo dated November 9, 2005, Ruiz offered this position to Amsel while expressing concern about Amsel's health and suggesting that Amsel may want to apply for disability benefits instead. In support of this recommendation, Ruiz cited Dr. Alsup's analysis of Amsel's condition: "Andrew has severe inoperable coronary artery disease and has had increasing frequency of his chest pain despite aggressive medical management. His condition is such that he could have an acute cardiac event at any time. His short and long-term prognosis is fairly poor." Ruiz also pointed out that the new position would "require regular office work hours," supervisor schedule approval, and that telecommuting would not be an option at that time. Amsel had repeatedly expressed a desire to continue working, despite his health conditions. Thus, he accepted the position.

Amsel alleges that even after he changed positions, TWDB left him on the outsourcing list, and required him to move his office four times in a twelve month period. Amsel also says that in March 2006, Glenn required him to work eight hours *in the office*, rather than the eight hours *total* that he was previously allowed in the IT department.

TWDB contends, however, that Amsel was only required to confirm the hours he would be in the office because his job was customer service-based and the team needed schedule consistency to serve its client-base. Amsel was still allowed to telecommute so long as his supervisor, Carla Daws ("Daws") approved. TWDB also provides an e-mail where Amsel responded to his new work requirements with approval, stating, "I enjoyed our conversation very much today. It made me feel very good about our working together in the future.

I intend to be an important asset to our team." Amsel's telecommuting was ultimately reduced from about two hours a day to one hour a day.

### *Amsel's FMLA History*

On May 30, 2006, Amsel was granted FMLA leave due to bronchitis. Amsel took intermittent leave between May 2006 and April 2007, and exhausted all leave associated with his May 2006 FMLA leave event on April 25, 2007.

In January 2007, after exhausting all his domestic medical options, Amsel traveled to Thailand to receive cardiac stem-cell treatment. Amsel took leave, relying on the FMLA leave associated with his May 30, 2006, bronchitis event. Upon Amsel's return in March 2007, he was unable to return to work but requested assignments he could perform from home or the ability to transition back part-time. TWDB did not provide Amsel with these opportunities because Amsel was on sick leave and not expected to work.

On April 11, 2007, Dr. Alsup submitted another FMLA application to TWDB and indicated that Amsel was "unable to work at all" under his present condition. Amsel, however, was ineligible for additional FMLA leave because he had not worked 1250 hours in the previous calendar year. TWDB thus awarded Amsel 720 hours from the sick-leave pool. Despite TWDB's grant of sick-pool leave, Amsel made inquiries to TWDB about his FMLA leave status in April and June of 2007.

### *Elimination of Amsel's Position*

On June 6, 2007, Amsel told Daws, his supervisor, that he was still interested in working from home, but that his situation was unchanged and he was not released to work. That same month, Glenn was informed of pending budget cuts by TWDB's Budget Director. Based on that shortfall, and a subsequent budget analysis, Glenn determined that two positions needed to be eliminated. She selected a vacant position as one and Amsel's position as the

other.     On July 3, 2007, Glenn sent Amsel a letter notifying him that his position was being eliminated, effective August 31, 2007.  Amsel applied, and was approved, for disability benefits to become effective on the date of his termination.

Amsel later sued TWDB for, *inter alia*, disability discrimination and FMLA retaliation.  On referral by the district court, the Magistrate Judge issued a Report and Recommendation to grant TWDB's motion for summary judgment.  The district court affirmed the Magistrate's report and rendered final summary judgment in favor of TWDB on all claims.  Amsel timely appealed.

## II.  STANDARD OF REVIEW

"We review a district court's grant of summary judgment *de novo*, applying the same standards as the district court."  *Noble Energy Inc. v. Bituminous Cas. Co.*, 529 F.3d 642, 645 (5th Cir. 2008).  Summary judgment is thus proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and internal quotation marks omitted).  "Doubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party."  *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir. 2003) (citation omitted).

## III.  DISCUSSION

On appeal, Amsel's only remaining claims are based on disability discrimination under the ADA and Rehabilitation Act, and retaliatory discharge in violation of the FMLA.

## A.     Amsel's Disability Discrimination Claim

Both the ADA, 42 U.S.C. § 12112(a), and the Rehabilitation Act, 29 U.S.C. § 794(a), prohibit discrimination on the basis of an employee's disability. The Rehabilitation Act adopts the standards used in determining claims under the ADA.  29 U.S.C. § 794(d); *see Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 503-04 (5th Cir. 2002).[1]

To sustain a claim for disability discrimination, Amsel must provide evidence sufficient to make out a prima facie case.  The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, . . . discharge of employees, . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).[2] To make out his prima facie case, Amsel must therefore show that he: (1) suffers from a disability; (2) was qualified for the job; (3) was subject to an adverse employment action; and (4) was replaced by a non-disabled person or was treated less favorably than non-disabled employees.  *See, e.g.*, *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995).

We respect Amsel's desire to work despite his disability.  However, we conclude that he has not raised a material fact issue as to whether or not he was

---

[1] We pause briefly to note that *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 363-64 (2001), immunizes TWDB from suit under the ADA for money damages.  The district court ruled, however, that this bar does not prevent Amsel from suing for prospective relief—reinstatement—under *Ex Parte Young*, 209 U.S. 123 (1908).  The district court also authorized Amsel to pursue all remedies authorized by law under the Rehabilitation Act.  We need not address the propriety of this ruling because Amsel fails to establish a prima facie case of disability discrimination under the ADA or Rehabilitation Act.

[2] The current version of the ADA incorporates the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008).  The ADAAA, however, only applies to claims arising on or after January 1, 2009, and thus does not apply to Amsel's claim. *See, e.g.*, *Carmona v. Sw. Airlines Co.*, 604 F.3d 848, 856-57 (5th Cir. 2010).  Many of the cases cited in this discussion will be superseded in whole or in part as applied to cases arising under the new law, but they are applicable here.

a "qualified individual" at the time of his discharge; thus, he cannot meet the second element of his prima facie case.[3]

### *"Qualified Individual"*

An individual is qualified under the ADA if, with or without reasonable accommodation, the person can perform the essential functions of the position. 42 U.S.C. § 12111(8); *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 477 n.32 (5th Cir. 2006).

Amsel admirably worked at TWDB for ten years without any kind of reprimand or a hint of evidence that he was unqualified to perform his duties. Amsel's medical documentation further supports his ability to work with reasonable accommodation through most of 2006. TWDB provided various accommodations throughout his tenure, allowing Amsel to telecommute, providing a flexible work schedule, and creating a new position for him when stress exacerbated his conditions. Despite his health problems during this time period, Amsel was undoubtedly a "qualified" individual under the ADA at that time. Amsel's problems, however, took a turn for the worse toward the end of 2006 and through the first half of 2007. The evidence undisputedly reflects that Amsel was completely unable to come to work at the time of the adverse employment action. Indeed, though his e-mails to TWDB expressed a desire to work from home, Amsel himself clearly indicated that he was not cleared to work.

Amsel was only "qualified" if he could do the job with reasonable accommodation. Amsel, however, was not able to come to work and had not been in the office for months at the time of his discharge. Indefinite leave is not a reasonable accommodation. *See, e.g.*, *Carmona*, 604 F.3d at 860 n.3; *Rogers v.*

---

[3] We may affirm based on any grounds supported by the record. *See Lifecare Hosps., Inc. v. Health Plus of La., Inc.*, 418 F.3d 436, 439 (5th Cir. 2005).

*Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759-60 (5th Cir. 1996) ("Nothing in the text of the reasonable accommodation provision requires an employer to wait an indefinite period for an accommodation to achieve its intended effect." (citation omitted)).

Amsel focuses on his qualifications during his overall tenure. However, the question here is whether he was qualified at the time his position was eliminated. At that point in time, Amsel had not been to work for five months, his FMLA leave had been exhausted, and he gave TWDB no indication of when he would again be cleared to return to work. Although he may have desired to work from home, he submitted nothing to TWDB showing his ability to work, from home or elsewhere. Furthermore, TWDB has consistently required at least some in-office time, and Amsel does not dispute the necessity of in-office time for purposes of customer service and team work. "Team work under supervision generally cannot be performed at home without a substantial reduction in the quality of the employee's performance." *Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) (per curiam) (citation and quotation marks omitted); *see also Carmona*, 604 F.3d at 859 ("Regular attendance is a necessary qualification for most jobs."). The undisputed summary judgment evidence shows that Amsel was not "qualified" for his job at the time of his dismissal because he could not perform the job's essential functions.

Because Amsel was not a "qualified individual" with a disability, he cannot establish a prima facie case of disability discrimination under the ADA or the Rehabilitation Act. We thus need not address the other prima facie elements, or the *McDonnell Douglas* burden-shifting analysis.[4]

---

[4] When the plaintiff's claim is based on circumstantial evidence of discrimination, this court applies the *McDonnell Douglas* burden-shifting framework. *See McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279 (5th Cir. 2000). If the plaintiff makes out a prima facie case, the burden shifts to the employer to produce evidence of a nondiscriminatory reason for the

**B.    Amsel's FMLA Claim**

The FMLA makes it unlawful for employers to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the Act.  29 U.S.C. § 2615(a)(1).  The FMLA also prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against any individual" for exercising FMLA-protected rights.  *Id.* § 2615(a)(2).  Amsel's only FMLA claim on appeal is a proscriptive one: that TWDB retaliated against Amsel for his exercise of a right protected under the Act.[5]

To survive summary judgment on an FMLA retaliation claim, Amsel must establish a prima facie case by showing: (1) he was protected under the FMLA; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the discharge.  *See, e.g.*, *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005) (citing *Hunt*, 277 F.3d at 768).[6]

---

employment action.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  If such evidence is proffered, the burden of production shifts back to the plaintiff to show by a preponderance of the evidence that the nondiscriminatory justification was mere pretext for discrimination.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

[5] "There is no significant difference between [a retaliation claim] under the FMLA and similar claims under other anti-discrimination laws."  *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 768 (5th Cir. 2001) (citation omitted), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

[6] Similar to claims under the ADA, if a plaintiff has established a prima facie case and is relying on circumstantial evidence of discrimination, the burden shifts to the defendant to proffer legitimate, non-retaliatory reasons for its adverse employment action.  *See Richardson*, 434 F.3d at 333.  If the defendant proffers a legitimate reason, the burden shifts back to the plaintiff to show that the employer's articulated reason is a pretext for retaliation or that, while true, it is coupled with a retaliatory motive.  *Id.* at 332-33.  In the event the employee can show that discrimination was at least a motivating factor in the employment decision, the burden shifts back to the employer to prove it would have taken the same action despite the discriminatory animus.  *Id.* at 333.

There is no dispute that Amsel suffered an adverse employment action. For this reason, we only discuss the first and third prongs of his prima facie case. As to Amsel's protected activity, the district court aptly concluded—and the parties do not dispute on appeal—that Amsel was no longer eligible for FMLA coverage at the time of his discharge. *See* 29 U.S.C. §§ 2611-12. The FMLA's proscriptive protections, however, encompass "the employer's conduct both during and after the employee's FMLA leave." *Hunt*, 277 F.3d at 768-69. This is in accord with Department of Labor regulations that restrict an employer from retaliating against an employee upon return from extended FMLA leave. *See* 29 C.F.R. § 825.220(c) (2012). For this reason, Amsel's past use of FMLA leave is protected activity sufficient to surpass the first prima facie element even though Amsel was not an "eligible employee," 29 U.S.C. § 2611(2), at the time of his discharge.[7]

We then turn to causation. The causal inquiry only looks to whether the employer retaliated against Amsel for his FMLA-protected conduct. As stated, the only protected activity at issue here is Amsel's *FMLA leave*, which ended on April 25, 2007, more than two months prior to his dismissal. While this time period is short, it is not, by itself, enough to show a causal connection based upon temporal proximity alone. *See, e.g.*, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (requiring "very close" proximity). Though the relevant time

---

[7] We disagree with the district court's conclusion that Amsel's later inquiries about FMLA leave were themselves protected activity. It is undisputed that he was not eligible for further leave at the time he inquired. *See Walker v. Elmore Cnty. Bd of Educ.*, 379 F.3d 1249, 1253 (11th Cir. 2004) ("There can be no doubt that the request—made by an ineligible employee for leave that would begin when she would still have been ineligible—is not protected by the FMLA."); *see also Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d 379, 383-84 (5th Cir. 1998) (concluding that the first prima facie prong of an FMLA retaliation claim was not met where an employer granted FMLA leave in error, and subsequently discharged the plaintiff). Amsel's June inquiries were made when Amsel was ineligible for FMLA leave and thus are not protected under the Act.

frame for what is considered "very close" varies,[8] the circumstances here do not indicate a causal relationship between Amsel's *FMLA leave* and his discharge.

Moreover, we have observed that timing alone "will not always be enough for a prima facie case." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 n.3 (5th Cir. 1997). Amsel is required to raise a fact question showing that the protected activity was not "wholly unrelated" to his discharge. *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001). The record, however, provides no support linking Amsel's discharge to his FMLA-protected activity. The evidence is actually to the contrary. In the face of Amsel's exhausted FMLA leave, TWDB provided Amsel 720 hours of extended sick-pool leave and 26 hours of emergency leave. These undisputed facts do not support a conclusion of retaliatory animus.[9]

Amsel's ultimate contention, then, comes down to the speculative argument that TWDB dismissed Amsel because it knew he was disabled and would likely continue to request FMLA leave. Such speculation does not support a causal inference. *See, e.g.*, *Mauder v. Metro. Transit Auth.*, 446 F.3d 574, 584 (5th Cir. 2006) (discounting plaintiff's conclusory allegations). Because Amsel fails to establish a causal connection between his adverse employment action

---

[8] "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Breeden*, 532 U.S. at 273 (quoting *Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001), and citing *Richmond v. Oneok, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4-month period insufficient)). *But see Richard v. Cingular Wireless LLC*, 233 F. App'x 334, 338 (5th Cir. 2007) (unpublished) (finding a two and a half month temporal disparity sufficient to support a causal connection).

[9] Amsel's unsupported allegations that TWDB moved his cubicle and maintained his position on the IT outsourcing list refer to events that occurred before Amsel sought FMLA leave. It thus strains logic to presume that TWDB evinced a retaliatory motive against Amsel for FMLA rights he had not yet exercised.

and his protected FMLA leave, he cannot establish a prima facie case of FMLA retaliation, and we need not address the *McDonnell Douglas* burden-shifting analysis.

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of Defendants-Appellees.