[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————

No. 16-11142

————————————

D.C. Docket No. 8:15-cv-00702-SCB-EAJ

RODNEY JONES,

Plaintiff-Appellant,

versus

GULF COAST HEALTH CARE OF DELAWARE, LLC,
a Foreign Limited Liability Corporation dba Accentia Health
and Rehabilitation Center of Tampa Bay,

Defendant-Appellee.

————————————

On Appeal from the District Court for the
Middle District of Florida

————————————

(April 19, 2017)

Before ROSENBAUM, JULIE CARNES, and GILMAN,* Circuit Judges.

---

* Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation

GILMAN, Circuit Judge:

Rodney Jones brought suit against his former employer, Gulf Coast Health Care of Delaware, LLC, doing business as Accentia Health and Rehabilitation Center of Tampa Bay (Accentia), under the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601–2654.  Approximately a month after returning from FMLA leave to have rotator-cuff surgery on his shoulder, Jones was suspended and subsequently fired from his job as Activities Director.  Jones claims that, in taking these actions, Accentia interfered with the exercise of his FMLA rights and later retaliated against him for asserting those rights.  The district court granted summary judgment in favor of Accentia on both claims.  For the reasons set forth below, we **AFFIRM** the judgment of the court with respect to Jones's interference claim, but **REVERSE** the judgment with respect to his retaliation claim and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.    Factual background

Jones served as Activities Director for Accentia, a long-term-care nursing facility, from 2004 until he was fired in 2015.  His duties included keeping up with resident charting and care plans, providing calendars for programming events, organizing volunteer programs, planning parties and outings, arranging entertainment activities for the residents, and generally overseeing his staff to

2

ensure that these various programs were carried out. Jones's job involved substantial desk work and planning, but his duties as Activities Director also included regular physical tasks such as unloading vehicles, decorating for parties, shopping for supplies, and traveling around the community for outreach programs. During the last two years of his employment, Jones also organized and participated in resident outings, which involved traveling around the community with residents, helping them get on and off the Accentia bus, and clearing paths for wheelchairs during these outings. Although Jones had five assistants to help him organize and execute activities, he preferred to be "hands-on" with planning and was always physically involved with setting up for volunteer events.

Jones learned in 2014 that he needed to undergo shoulder surgery in order to repair his torn rotator cuff, and that he would need to take time off from work to recover from the surgery. Accentia determined that Jones was eligible for FMLA leave and granted him time off from September 26, 2014, until December 18, 2014, so that he could undergo the surgery and fully recover. He was scheduled to return to work on December 19, 2014. But on December 18, 2014, Jones's doctor reported that Jones would not be able to return to work and resume physical activity until February 1, 2015. The report also stated that Jones needed to continue physical therapy on his shoulder.

3

Despite the recommendations of Jones's doctor and Jones's own physical limitations, he still wished to return to his job as Activities Director at the end of his FMLA leave. Jones understood his doctor's report to simply mean that he needed to continue physical therapy, not that he was prohibited from working entirely. He therefore asked his supervisor, Donald Daniels, to allow him to return to work on light duty. Jones wished to perform desk duty and computer work, with his staff to cover the physical aspects of his job. Daniels, however, refused to reinstate Jones as Activities Director until Jones could submit an unqualified fitness-for-duty certification, which Jones's doctor failed to issue before the end of the FMLA period.

Jones maintains that, if Daniels had allowed him to return on light duty, Jones's doctor would have certified him to return to work in this capacity. But because Daniels was adamant that Jones could not return to work on light duty, Jones did not ask his doctor for a light-duty certification. Jones instead requested additional time off from Accentia and was granted another 30 days of non-FMLA medical leave in order to complete his physical therapy. He felt that he was forced by Daniels into requesting this additional leave.

While on the 30 days of additional leave, Jones twice visited the Busch Gardens theme park in Tampa Bay, Florida and went on a trip to St. Martin. Jones spent his time at Busch Gardens walking around and taking pictures of the park's

4

Christmas decorations.  He sent these pictures to his staff via text message, hoping to give them ideas for decorating Accentia's facilities.  Jones also visited his family in St. Martin for three days.  He posted photos from these trips on his Facebook page, including pictures of himself on the beach, posing by a boat wreck, and in the ocean.

Jones eventually returned to work on January 19, 2015 as planned, meeting with Daniels at the beginning of the day.  During the meeting, Jones presented Daniels with a fitness-for-duty certification confirming that Jones could immediately resume his job as Activities Director.  Daniels responded by showing Jones the photos from Jones's Facebook page, which depicted the trips that he had taken while on medical leave.

When Jones asked Daniels how he had obtained the photos, Daniels responded that "you can thank your wonderful staff, they just ratted you out," but also remarked that "maybe if you're going to have a Facebook account, you shouldn't have it on public."  Daniels then informed Jones that "corporate" believed, based on these Facebook posts, that Jones had been well enough to return to work at an earlier point.  Jones was subsequently suspended so that Daniels could investigate his conduct during medical leave.  Although Jones was given an opportunity to respond to these charges in a letter, he failed to do so.  Several days later, Jones's employment was terminated.

5

**B.    Procedural background**

In February 2015, Jones brought suit against Accentia in Florida state court. Jones alleged that, in suspending and later terminating him, Accentia interfered with the exercise of his FMLA rights and retaliated against him for asserting those rights.   Accentia removed the action to the United States District Court for the Middle District of Florida, and subsequently moved for summary judgment on both of Jones's claims.   In February 2016, the district court granted Accentia's motion for summary judgment, holding that Jones had failed to establish a prima facie case of either interference or retaliation under the FMLA.  This timely appeal followed.

## II. STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment, "viewing all the evidence, and drawing all reasonable inferences, in favor of the non-moving party."  *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005).  Summary judgment is proper only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.*; Fed. R. Civ. P. 56(c).

## III.    DISCUSSION

### A.    The FMLA

The FMLA grants eligible employees a series of entitlements, among them the right to "a total of 12 workweeks of leave during any 12-month period" for a number of reasons, including "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  To preserve and enforce these rights, "the FMLA creates two types of claims:  interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act . . . [,] and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (internal citations omitted); *see also* 29 U.S.C. § 2615(a)–(b); 29 C.F.R. § 825.220(c).  Jones brought claims against Accentia for both interference and retaliation in connection with the exercise of his FMLA rights.

### B.    Jones's interference claim

The interference claim is based on Accentia's refusal to allow Jones to return to work with certain physical limitations, even though two other employees with different job functions had been allowed to do so.  Jones had requested on multiple occasions that he be allowed to resume his job as Activities Director on

"light duty," but he was denied such a reinstatement.  Accentia's response is two-fold: (1) that Jones forfeited his FMLA right to reinstatement when he requested and obtained extended medical leave at the end of his FMLA leave, and (2) that Jones failed to provide Accentia with a fitness-for-duty certification, which the company uniformly requires employees to submit before returning from FMLA leave.  The district court granted Accentia's motion for summary judgment on this issue, holding that Jones had failed to establish a prima facie case for his FMLA interference claim.

To establish a prima facie case for interference, Jones needed to "demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *See Strickland*, 239 F.3d at 1207.  He does not, however, "have to allege that his employer intended to deny the right; the employer's motives are irrelevant." *Id.* at 1208.  Indeed, an employee returning from FMLA leave is entitled "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position.  29 U.S.C. § 2614(a)(1).  Jones claims that his substantive right to reinstatement under the FMLA was violated by Accentia.  But Jones failed to show that he was actually entitled to reinstatement.

As an initial matter, the FMLA "provides for only 12 weeks of leave" and "does not suggest that the 12 week entitlement may be extended." *McGregor v.*

8

*AutoZone, Inc.*, 180 F.3d 1305, 1308 (11th Cir. 1999).  Jones's FMLA leave began on September 26, 2014, and ended on December 18, 2014.  At the expiration of his FMLA leave, Jones requested and was given another 30 days of separate medical leave.  Significantly, this additional medical leave was *not* an extension of Jones's FMLA leave.

Relevant caselaw suggests that an employer does not interfere with an employee's right to reinstatement if that employee is terminated after taking leave in excess of the 12 weeks permitted by the FMLA.  *See Armbrust v. SA-ENC Operator Holdings, LLC*, No. 2:14-CV-55-FTM-38CM, 2015 WL 3465760, at *5 (M.D. Fla. June 1, 2015) (holding that an employee did not have a claim for interference when "he was given the full twelve (12) weeks under the FMLA and his termination occurred after his FMLA leave expired"); *Bender v. City of Clearwater*, No. 8:04-CV-1929-T23EAJ, 2006 WL 1046944, at *11 (M.D. Fla. Apr. 19, 2006) ("Where an employee is absent for more than the protected period of time, the employee does not have a right to be restored to his prior or similar position.").  Jones argues that this line of cases is irrelevant because he requested to return to his job as Activities Director at the end of his FMLA leave, but was instead forced to request an additional 30 days of medical leave.

He was not, however, "forced" to take the additional leave; rather, he requested the 30-day extension because he was physically unable to resume his job

duties at the end of his FMLA leave.  But even assuming that Jones did not waive his right to reinstatement when he took additional medical leave, he has failed to establish a prima facie case for interference.  In November and December 2014, Jones told his supervisor, Donald Daniels, that he wanted to return to work on light duty.  As part of this light duty, Jones hoped to perform his desk-duty functions but have his assistants perform the physical aspects of his job. Daniels, however, refused to allow Jones to return to work in a diminished capacity, instead requiring him to submit a full fitness-for-duty certification before returning to work.

The FMLA regulations provide that an employee returning from FMLA leave who cannot perform the essential functions of his job due to a physical condition need not be reinstated or restored to another position.  29 C.F.R. § 825.216(c) ("If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition or an injury or illness also covered by workers' compensation, the employee has no right to restoration to another position under the FMLA.")

In addition, an employer may lawfully require a fitness-for-duty certification without interfering with the exercise of an employee's FMLA rights.  *See Drago v. Jenne*, 453 F.3d 1301, 1306–07 (11th Cir. 2006) (holding that "the FMLA allows an employer to require that an employee present a Return to Work Authorization

form before he returns from FMLA leave"); 29 C.F.R. § 825.313(d) ("Unless the employee provides either a fitness-for-duty certification or a new medical certification for a serious health condition at the time FMLA leave is concluded, the employee may be terminated."). The FMLA explicitly provides for such a certification, noting that "the employer may have a uniformly applied practice or policy that requires each such employee to receive certification from the health care provider of the employee that the employee is able to resume work." 29 U.S.C. § 2614(a)(4).

Jones does not dispute the accuracy or applicability of these FMLA provisions, nor does he dispute the fact that Accentia required employees returning from FMLA to submit fitness-for-duty certifications. He instead argues that Daniels interfered with the exercise of Jones's FMLA rights by dissuading him from submitting a light-duty certification, even though he had previously allowed other Accentia employees to return to work with such certifications. Specifically, Jones points to two Accentia employees, Kristine O'Leary and Faith Turner, who submitted fitness-for-duty certifications and were permitted to return to work despite having physical limitations. Even assuming that the record supports Jones's contention that Daniel's dissuaded him from submitting a light-duty certification, however, he cannot show that Accentia's fitness-for-duty certification policy was violative of the FMLA.

11

As an initial matter, O'Leary and Turner both submitted fitness-for-duty certifications to Accentia before returning to work, which Jones failed to do. The only documentation that Jones submitted at the end of his FMLA leave was a report from his doctor stating that (1) he needed to be excused from work until February 1, 2015, at which time he could return to full physical activity, and (2) he required continuing physical therapy. But this report does not constitute a fitness-for-duty certification because it does not specify that Jones "is able to resume work." *See* 29 U.S.C. § 2614(a)(4). By contrast, O'Leary submitted a fitness-for-duty certification that fully released her for immediate work. Turner was also cleared to work, although her fitness-for-duty certification indicated that she required "rests from walking."

Jones argues that, like Turner, he wished to submit a fitness-for-duty certification that included certain physical restrictions. He also contends that, in denying him that option, Daniels failed to apply Accentia's fitness-for-duty certification policy in a uniform fashion, as required by the FMLA. The applicable FMLA regulation defines a uniform fitness-for-duty certification policy as one that applies to "all similarly-situated employees (i.e., same occupation, same serious health condition) who take leave for such condition." 29 C.F.R. § 825.312(a).

Whether O'Leary or Turner are proper comparators under this definition of "uniform" is a key issue in this case. First, Jones did not have the same occupation

12

as O'Leary, a health administrator, or Turner, an admissions assistant. Although Jones's job as Activities Director involved substantial sedentary work—such as keeping up with resident care plans, providing program calendars, arranging activities, and overseeing staff—his job was more physically demanding than those of either O'Leary or Turner. Jones was regularly required to engage in such physical activities as unloading vehicles, decorating for parties, shopping for supplies, and traveling around the community for outreach programs. By comparison, Turner was responsible for taking calls, reviewing faxes, and completing paperwork. The only physical aspect of Turner's job involved conducting occasional tours of the facility for prospective residents and their families.

Jones, who was recovering from rotator-cuff surgery, also failed to show that he suffered from the same serious health condition as either O'Leary or Turner, who were both recovering from foot maladies. O'Leary underwent foot surgery to remove a melanoma and was fully cleared to return to her job at the end of her FMLA leave. Upon her return to Accentia, O'Leary wore a "shoe-boot" given to her by her physician only because her regular shoes did not yet fit. Turner, on the other hand, took FMLA leave to recover from a broken foot and returned to Accentia wearing a medical short boot. Her only physical limitation at work involved taking rests from walking.

13

By contrast, Jones's health condition affected his shoulder and was significantly more physically limiting.  The December 2014 report from Jones's doctor stated that Jones needed additional physical therapy and should avoid physical activity until February 2015.  Jones admits that his doctor did not clear him to resume his usual responsibilities as Activities Director because his shoulder injury was "too fresh."  In fact, both Jones's doctor and his physical therapist were worried that common workplace activities, such as pushing a wheelchair or lifting objects, might cause Jones's shoulder to retear, further prolonging his recovery.

In sum, Jones has not shown that any similarly situated Accentia employee was permitted to return from FMLA leave without submitting the required fitness-for-duty certifications.  O'Leary's fitness-for duty certification did not indicate that she had any physical restrictions.  And even if Turner's fitness-for-duty certification—requiring that she take periodic rests from walking—can be construed as a light-duty certification, Jones has failed to show that either O'Leary or Turner are proper comparators.  Neither one had a job as physically demanding as Jones's, nor were their injuries as physically limiting.  The record therefore does not support Jones's claim that Accentia failed to apply its fitness-for-duty certification policy in a uniform fashion.

Because Jones likely waived his FMLA right to reinstatement by taking an additional 30 days of medical leave, because he failed to submit a fitness-for-duty

14

certification by the end of his FMLA leave, and because the record is devoid of proof challenging Accentia's contention that its fitness-for-duty certification policy was implemented in a uniform fashion, Jones lost the right to be reinstated after failing to comply with this policy. In sum, Jones has not shown that he was denied a benefit to which he was entitled under the FMLA. The district court therefore did not err in granting summary judgment to Accentia on Jones's interference claim.

## C.    Jones's retaliation claim

Jones also appeals the district court's grant of summary judgment to Accentia on his claim of retaliation under the FMLA. He maintains that Accentia retaliated against him for taking FMLA leave when it suspended and then terminated his employment. To succeed on this claim, Jones must demonstrate that Accentia "intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *See Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001). In other words, Jones must show "that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'" *Id.* (quoting *King v. Preferred Tech. Grp.*, 166 F.3d 887, 891 (7th Cir. 1999)). Jones claims on appeal that he can prove Accentia's retaliatory intent using both direct and circumstantial evidence.

15

Direct evidence "reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks omitted). If believed, direct evidence "proves [the] existence of [a] fact without inference or presumption." *Id*. (quoting *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997)) For that reason, "'only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of' some impermissible factor constitute direct evidence of discrimination." *Id.* (quoting *Rojas v. Florida*, 285 F.3d 1339, 1342 n. 2 (11th Cir. 2002)). Jones puts forth two statements as direct evidence of retaliation: (1) Daniels's comment that "corporate" would not like the timing of Jones's FMLA leave during the "survey window," and (2) Daniels's remark that Jones was being suspended because corporate believed that he had abused and misused his FMLA leave.

Neither of these comments constitutes direct evidence of retaliation because they do not prove, without requiring an inference, that Accentia discriminated against Jones based on the exercise of his FMLA rights. A comment about the timing of Jones's leave is not a "blatant remark" that proves discrimination, and a comment about the *abuse* and *misuse* of FMLA leave does not establish Accentia's

16

consideration of impermissible factors. These comments might suggest but do not prove Accentia's discriminatory motive, so Daniels's statements are better considered as circumstantial evidence of retaliation. *See id.*

Because Jones has put forth no direct evidence of retaliation, we must employ the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to analyze his retaliation claim. *See Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010). "Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case by demonstrating (1) [he] engaged in statutorily protected activity, (2) [he] suffered an adverse employment decision, and (3) the decision was causally related to the protected activity." *Id.* The burden shifts back to Accentia if Jones can establish a prima facie case, requiring Accentia to "articulate a legitimate, nondiscriminatory reason" for his termination. *See id.* Finally, if Accentia meets this burden, then Jones must show that the supposedly legitimate reason was in fact a pretext designed to mask illegal discrimination. *See id.* at 1244.

The district court held that Jones had failed to establish a prima facie case of retaliation under the *McDonnell Douglas* framework. Accentia does not dispute the court's finding that Jones met the first two prongs of the framework's prima facie test. That is, it agrees that Jones engaged in a protected activity by taking

17

FMLA leave and that he suffered an adverse employment action when he was terminated.   The issue on appeal therefore centers around the court's conclusion that Jones failed to establish causation, the third prong of the *McDonnell Douglas* prima facie test.  "To establish a causal connection, a plaintiff must show that the relevant decisionmaker was 'aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013) (quoting *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)). "Generally, a plaintiff can show the two events are not wholly unrelated if the plaintiff shows that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010).

Jones points to the timing between his return from FMLA leave and his termination to prove causation.  "Close temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.'" *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (quoting *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)).  But "temporal proximity, without more, must be 'very close'" in order to satisfy the causation requirement.  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d

18

1361, 1364 (11th Cir. 2007) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, (2001)) (holding that "[a] three to four month disparity" between the statutorily protected conduct and the adverse employment action is too long to establish temporal proximity).

Although Jones and Accentia agree on these general principles, they disagree with respect to how temporal proximity should be measured. Accentia argues, and the district court agreed, that temporal proximity should be calculated from the date that Jones *began* his FMLA leave (September 26, 2014) until the date that he was terminated (January 23, 2015). Because nearly four months passed between these two events, the court concluded that this temporal gap was too long to establish a prima facie case of a causal connection. Jones, on the other hand, argues that the relevant time period is between the date that his FMLA leave *ended* (December 18, 2014) and the dates of his suspension and termination (January 19, 2015 and January 23, 2015, respectively). This one-month period, he asserts, is sufficiently close to raise an inference of a causal connection. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (holding that "a period as much as one month between the protected expression and the adverse action is not too protracted" to establish causation).

Our circuit has yet to address this issue in a published decision. Unpublished opinions go both ways. *See Penaloza v. Target Corp.*, 549 F. App'x

19

844, 848 (11th Cir. 2013) (measuring temporal proximity, for purposes of an FMLA retaliation claim, as "the time period between [the plaintiff's] request for leave and her termination"). *But see Diamond v. Hospice of Florida Keys, Inc.*, No. 15-15716, 2017 WL 382310, at *7 (11th Cir. Jan. 27, 2017) (holding that the plaintiff, who took FMLA leave for about 13 days between March 21 and April 21, 2014 established an inference of causation for purposes of an FMLA retaliation claim when "two weeks after April 21, on May 5, she was fired"); *see also Lamar v. Pilgrim's Pride Corp.*, No. 3:13-CV-1101-J-34JBT, 2015 WL 5440342, at *11 (M.D. Fla. Sept. 15, 2015), *appeal dismissed*, No. 15-14598 (11th Cir. Mar. 31, 2016) (holding that the plaintiff, who took FMLA leave from April 12 to 15, 2013, and again on May 2, 2013, established a causal connection for the purpose of a prima facie FMLA retaliation case when his employer "terminated [him] less than two weeks after his last day of approved FMLA leave").

The time is therefore ripe to clarify the law on this issue. We now hold that temporal proximity, for the purpose of establishing the causation prong of a prima facie case of FMLA retaliation, should be measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs. We have previously indicated that, in the context of an FMLA interference claim, temporal proximity is measured in this way. *See Evans v. Books-A-Million*, 762 F.3d 1288, 1297 n.6 (11th Cir. 2014) (noting that, because a decision to reassign

20

the plaintiff was made almost immediately upon her return from leave, "[a] reasonable fact finder could conclude that [the plaintiff's] reassignment constituted an unlawful act of interference with her FMLA right to be reinstated to her former position").

Policy considerations also support the conclusion that temporal proximity, for the purpose of establishing the causation prong of a prima facie case of FMLA retaliation, should be measured from the last day of an employee's FMLA leave. To hold otherwise would undermine the remedial purposes of the FMLA. In other words, measuring temporal proximity from the date that an employee first began FMLA leave would disadvantage those employees, such as Jones, who need to take the full 12 weeks of FMLA leave at one time. Because "[a] three to four month disparity between the statutorily protected expression and the adverse employment action" is considered too remote to create in inference of causation, *see Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007), these employees would never be able to establish a prima facie case for FMLA retaliation based on temporal proximity. This outcome is unacceptable and contradictory to our caselaw, which establishes that the causation prong of the *McDonnell Douglas* prima facie test is to be interpreted broadly and "is satisfied if a plaintiff shows that the protected activity and adverse action were 'not wholly unrelated.'" *See Krutzig v. Pulte Home Corp*., 602 F.3d 1231, 1234 (11th Cir.

21

2010) (quoting *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)).

Finally, we often look outside our circuit for guidance in crafting new precedent. But neither party has cited, and our research does not reveal, any consensus in this area of the law. Few of our sister circuits have even addressed the precise point from which temporal proximity, for the purpose of establishing the causation prong of a prima facie case of FMLA retaliation, should be measured. Moreover, those appellate courts that have directly addressed this issue have reached differing conclusions. *See, e.g.*, *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 410 (6th Cir. 2014) ("[W]e have measured temporal proximity from the date FMLA leave expired, not just when the employee first requested it, for the purposes of measuring temporal proximity."); *Amsel v. Texas Water Dev. Bd.*, 464 F. App'x 395, 401–02 (5th Cir. 2012) (measuring temporal proximity, for the purpose of establishing the causation prong of a prima facie case of FMLA retaliation, from an employee's return from FMLA leave). *But see Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (holding that "this court looks to the date an employer knew of an employee's use (or planned use) of FMLA leave, not the date it ended" for the purpose of determining prima facie causation in an FMLA retaliation case). These conflicting decisions primarily reinforce the need for clarification on this issue.

22

Despite the lack of consensus, we believe that both the caselaw within our circuit and fundamental policy concerns favor the proposition that temporal proximity, for the purpose of establishing the causation prong of a prima facie case of FMLA retaliation, should be measured from the last day of an employee's FMLA leave.  Based on this understanding of temporal proximity, Jones has met his burden of raising a genuine dispute as to whether his taking of FMLA leave and his termination were casually related.

Additional evidence, moreover, corroborates our conclusion.  Jones submits that Daniels's statements—the same ones that Jones put forth as direct evidence of retaliation—also establish a prima facie causal link between his taking of FMLA leave and his termination.  We agree in part.  Daniels's comment that Jones was being suspended for abusing and misusing FMLA leave is not evidence of retaliation if Daniels can establish a good-faith basis for believing that Jones indeed abused such leave.  But Daniels's alleged comment that "corporate was not going to like the fact that [Jones] was taking FMLA leave during the 'survey window'" corroborates Jones's claim that his FMLA leave and his termination were not "wholly unrelated."  *See Krutzig*, 602 F.3d at 1234; *see also Diamond v. Hospice of Florida Keys, Inc.*, No. 15-15716, 2017 WL 382310, at *7 (11th Cir. Jan. 27, 2017) (holding that the causation prong for the purpose of a prima facie FMLA retaliation claim was satisfied when the plaintiff was fired less than two

23

weeks after her last day of FMLA leave and the "evidence of temporal proximity [was] strongly corroborated" by her supervisor's negative comments regarding her FMLA leave).  Jones has therefore raised a genuine dispute of material fact with respect to the causation prong of a prima facie case for FMLA retaliation.

Because the district court held that Jones had not established a prima facie case of retaliation, it did not complete the analysis under the burden-shifting *McDonnell Douglas* framework.  The court, in other words, did not address Accentia's alleged legitimate, nondiscriminatory reasons for firing Jones nor did it determine whether those reasons were pretextual.  Although a remand to the district court for the consideration of these issues would normally be appropriate, such a remand is not necessary where the record is "sufficiently developed for us to decide" the issue.  *See Cuddeback v. Fla. Bd. of Educ.*, 381 F.3d 1230, 1236 n. 5 (11th Cir. 2004).  And because the record in this case so clearly demonstrates that there is a genuine dispute of material fact as to whether Accentia's proffered reasons for Jones's termination were pretextual, "a remand here would be a waste of time and judicial resources."  *See id.*  We therefore move forward with the remaining steps of the *McDonnell Douglas* analysis.

Accentia has met its burden to produce legitimate, nondiscriminatory reasons for Jones's termination.  *See Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) ("[T]he employer's burden is merely one of production;

24

it need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)). Accentia contends that Jones was fired because he (1) posted photos from his outings in violation of the company's social-media policies, and (2) displayed poor judgment as a supervisor in posting these photos, even if this activity did not violate the company's social-media policies. Jones argues, however, that these proffered reasons are pretextual, and that he was really fired in retaliation for the exercise of his FMLA rights. Specifically, Jones argues that there is no evidence that he violated Accentia's leave policies or its social-media policies. He further argues that Accentia's proffered reasons for his termination are inconsistent and implausible.

To show pretext, Jones must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Chapman*, 229 F.3d at 1024 (quoting *Combs*, 106 F.3d at 1528). But Jones cannot show that Accentia's proffered reasons for terminating him were pretexual simply by "quarreling with the wisdom" of those reasons. *See Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *Chapman*, 229 F.3d at 1030). He may,

25

however, establish pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *See Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont De Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc)).

Jones has put forth sufficient evidence to create a genuine dispute of material fact as to whether Accentia's reasons for terminating him were inconsistent and therefore pretextual.  The formal letter sent to Jones from Accentia, terminating his employment, stated only that "As you have declined to provide any additional information, the decision has been made to terminate your employment effective immediately based on the information available." According to Jones, the only explanation provided to him at the time that he was suspended and then terminated was that he was being fired for abusing and misusing FMLA leave by engaging in activities, posted on his Facebook page, that demonstrated his ability to have earlier returned to work.

Jones was not told when he was fired, however, that he had violated Accentia's social-media policy or that his posts on Facebook indicated poor managerial judgment.  And, during his deposition testimony, Daniels cited a myriad of additional reasons that purportedly influenced his decision to terminate

Jones, including Daniels's view that Jones unnecessarily prolonged his recovery and went on vacation when he should have been recuperating from his surgery.

Daniels could point to no company policy requiring Accentia employees to remain at home or refrain from traveling while on medical leave. Instead, Daniels maintained that Jones violated the "spirit" of medical leave—to rehabilitate and recover. Daniels also remarked that the posted photos indicated that Jones did not receive therapy for a week and that he was exceeding his medical restrictions. But a letter from Jones's physical therapist stated that Jones was a model patient who never missed a therapy session. Daniels also acknowledged that, before terminating Jones, he was aware that Jones had never missed any therapy sessions. The evidence supporting Daniel's claim that Jones abused medical leave by going on vacation is therefore murky at best. In fact, a jury could reasonably conclude that Daniel's explanations are inconsistent, contradictory, and implausible.

On appeal, Accentia also argues that Jones was terminated for posting photos on Facebook that violated the company's social-media policy, which states that employees can be terminated if their social-media posts have an adverse effect on coworkers. Daniels claimed that these posts had an adverse effect on Accentia employees because the photos were anonymously reported and because he heard gossip regarding the photos circulating throughout the workplace. Accentia maintains that these photos therefore created a morale issue among employees.

27

But Jones was not informed during his suspension meeting or in his termination letter that he had violated Accentia's social-media policy.  In addition, Daniels conducted no further investigation regarding the anonymous complaint, and neither he nor any other Accentia official could identify any employee who was adversely affected by Jones's Facebook posts.  Finally, there is evidence that the purpose of Accentia's social-media policy, as discussed during managerial training, is to prevent employees from posting harmful or negative comments about the company's staff or facilities.  Jones's Facebook posts were clearly far afield from this area of concern.

In sum, the record indicates a number of inconsistencies and contradictions with respect to Accentia's proffered reasons for terminating Jones.  "We have recognized that an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext." *Hurlbert v. St. Mary's Health Care Sys.*, Inc., 439 F.3d 1286, 1298 (11th Cir. 2006).  These inconsistencies should also be considered in conjunction with Daniel's comment to Jones that corporate would not like the timing of his FMLA leave, as well as the temporal proximity between his return to work and his termination.  *See id.* (noting that close temporal proximity to an employee's protected FMLA activity and his termination "is evidence of pretext, though probably insufficient to establish pretext by itself").  When viewed in the light most favorable to Jones, the totality

28

of the evidence establishes that there is a genuine dispute of material fact with respect to whether Accentia's reasons for terminating Jones were pretextual. The district court therefore erred in granting Accentia's motion for summary judgment on Jones's FMLA retaliation claim.

## IV.    CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the court with respect to Jones's interference claim, but **REVERSE** the judgment with respect to his retaliation claim and **REMAND** the case for further proceedings consistent with this opinion.