Amy Totenberg, United States District Judge
This case involves alleged disability discrimination in the workplace. Plaintiff Amber M. Meade suffers from migraines and depression. She previously worked at Defendant General Motors LLC ("GM") for over two years, during which time she took several months' worth of paid disability leave and intermittent FMLA leave due to her medical condition. She claims that GM denied her request for a reasonable accommodation - thirty days of additional leave - and then terminated her based on her disability and her use of leave. Ms. Meade sued GM for violating the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), the Employment Retirement Income Security Act ("ERISA"), and the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). Defendant's Motion for Summary Judgment [Doc. 58] is now before the Court.
I. Background[1]
A. Ms. Meade's Medical Issues, FMLA Leave, and Other Leave
From May 13, 2013 through December 18, 2015, Ms. Meade was employed at GM as a software developer. Her position title was SAP Developer.
Ms. Meade has suffered from migraine headaches most of her life, and she also suffers from depression, anxiety, and panic attacks. Her stress levels affect the severity and frequency of her migraines. During Ms. Meade's time at GM, several events caused stress in her life, including the deaths of her father and grandmother and financial difficulties following her divorce. (Meade Depo., Doc. 60 at 23-27.) When she experienced a migraine, more often than not she was unable to do her work, as she could not look at a computer screen and could not focus on technical aspects of her job.
Under the FMLA, a qualified employee is entitled to 12 weeks (or 60 work days) of unpaid leave for medical issues within a one-year period. 29 U.S.C. § 2612(a). Both sides agree in this case that Ms. Meade was entitled to 12 weeks of FMLA leave per year. Where it is medically necessary, an employee may take FMLA leave "intermittently or on a reduced leave schedule," meaning the employee takes leave in blocks of time as opposed to taking the full 12 weeks of leave at once. 29 U.S.C. § 2612(b).
Due to her health issues, Ms. Meade took intermittent FMLA leave at various times between August 2014 and December 2015. (Id. at 63-64, Ex. 28.) GM granted Ms. Meade's requests for intermittent FMLA on August 29, 2014 (id. , Ex. 29); October 21, 2014 (id. , Ex. 30); November 6, 2014 (id. , Ex. 31); January 5, 2015 (id. , Ex. 32); January 16, 2015 (id. , Ex. 33); March 5, 2015 (id. , Ex. 37); March 11, 2015 (id. , *1264 Ex. 38); and October 6, 2015 (id. , Ex. 45). Additionally, Ms. Meade took paid short-term disability leave for 72 days from March 17, 2015 through June 28, 2015. Upon return from her disability leave, Ms. Meade requested and was granted an accommodation permitting her to work half days between July 15, 2015 and July 29, 2015, where GM charged half a day of FMLA leave per day.
In 2015 alone, Ms. Meade's supervisor at the time, Shane Johnston, calculated her absences from work as totaling approximately 152 days. The 152 days break down as follows: 17 days for vacation; 9.5 days for "other approved absences"; 23.5 days for "unapproved/ invalidated absences" where Ms. Meade requested FMLA but it was denied; 8.25 days for sick days; 72 days for short-term disability leave; and 22.5 days for intermittent FMLA. (Johnston Depo., Doc. 63-2, Ex. 22.) GM asserts that 118 of these days were related to Ms. Meade's medical conditions in 2015: 23.5 days for unapproved FMLA, 72 days for short-term disability leave, and 22.5 days for intermittent FMLA. Mr. Johnston created a spreadsheet that tracked Ms. Meade's absences from work. He based the spreadsheet on the emails between himself and Ms. Meade regarding her absences. (Johnston Depo., Doc. 63-2, Exs. 21-22.) While Ms. Meade testified that she did not know how many days she was absent from work during 2015 (Meade Depo., Doc. 60 at 128-29), she does not present any concrete evidence showing that Mr. Johnston's spreadsheet is incorrect. The Court therefore proceeds based on the numbers in Mr. Johnston's spreadsheet.
When asked during her deposition if she was aware that "time off for [short-term] disability can also count towards your FMLA leave," Ms. Meade answered that the policies are "very confusing." (Meade Depo., Doc. 60 at 128-29.) At one point, she testified as to how she understood her short-term disability leave in early 2015 to overlap with her FMLA benefits:
Q. Well, did you have any other type of FMLA leave other than intermittent?
A. When - again, FMLA and sickness and accident benefits are confusing to me and how they can overlap each other. So when I took sickness and accident leave earlier in the year it's my understanding that I was also on FMLA.
Q. Right.
A. So - for that. So if you ask me if I was on FMLA, then, yes, I was, in that instance.
Q. Okay. I see your point. So there is really two types of FMLA leave you have. One was your sickness and accident leave, which was also FMLA leave, but you were out for a continuous period of dates.
A. Yes.
Q. Two months?
A. It might have been three.
Q. I think so. I think about three months. So that's one type of FMLA leave, and then later on - and that was in 2015; right?
A. Yes.
(Id. at 184-85.) At another point, when asked if she remembered whether GM designated her short-term disability leave as FMLA, she responded, "I have no idea. That's all very confusing." (Id. at 210.) In her declaration, Ms. Meade also stated: "I am not certain, but I do not believe that GM designated my STD [short-term disability leave] as FMLA leave." (Meade Declaration, Doc. 70-2 ¶ 3.)
Additionally, Ms. Meade testified that she was granted several extensions for her FMLA leave - meaning that GM gave her additional unpaid leave beyond the statutory *1265 requirement of 12 weeks. She acknowledged that her requests for FMLA extensions were never denied. (Meade Depo., Doc. 60 at 129.) For example, GM granted Ms. Meade an extension of FMLA leave as late as September 14, 2015. (Id. , Ex. 43.)
B. Ms. Meade's Work Performance
During her employment at GM, Ms. Meade had different supervisors who reviewed her work and her performance. During 2014, she was supervised by Vinod Kadadi and Salil Diskalkar. On July 28, 2014, Mr. Kadadi emailed GM's Human Resources Department that Plaintiff's performance was "below the expectations of an employee in her grade level," specifically noting her delays in work completion and that her quality of work was "not up the mark." (Meade Depo., Doc. 60, Ex. 8.) Mr. Kadadi stated that Ms. Meade had been out of the office for 45 work days since January 1, 2014 and that these absences "resulted in missed timelines and increased work allocation to other team members." (Id. )
On August 14, 2014, Ms. Meade received a letter from GM regarding her "continued attendance problem." (Id. , Ex. 10.) The letter stated that Ms. Meade had taken 49 days off of work so far in 2014, which created a disruption to her team, and that she had scheduled vacation days without prior approval from her supervisor. Per the letter, Ms. Meade was specifically instructed to report absences to either of her supervisors no later than 8:30 A.M. the day she planned to be absent. (Id. ) Ms. Meade met with GM to discuss the contents of the August 14, 2014 letter. She found the instructions in the letter were acceptable, though she disputed GM's tally of her sick days versus her planned vacation days. (Id. at 113-14.) On October 21, 2014, Ms. Meade received another letter from GM regarding her attendance. (Id. , Ex. 11.) The letter listed a number of absences on certain dates that, according to GM, Ms. Meade had failed to properly report under GM's requirements. (Id. ) Ms. Meade again met with GM about the letter, and she told GM that she disputed the letter to the extent that she did contact the absence reporting hotline for each day she was absent. (Id. at 118.)
On November 10, 2014, Mr. Diskalkar issued a Performance Summary Feedback report to Ms. Meade. (Id. , Ex. 4.) Mr. Diskalkar stated in the report that Ms. Meade had struggled to deliver high quality output, that she had failed to deliver on critical assignments and her work had to be reassigned, that she often took a "defensive tone," and that her contributions and productivity were "significantly less than [her] peers," among other things. (Id. ) At the end of the report, Mr. Diskalkar stated that Ms. Meade's continued employment with GM was "in jeopardy" and that failure to improve her performance and productive may result in termination or other employment action. (Id. ) In her deposition, Plaintiff admits that her time off of work due to health issues negatively affected her ability to complete work assignments by certain deadlines. (Meade Depo., Doc. 60 at 106-07.)
Due to a reorganization at GM, Shane Johnston became Ms. Meade's supervisor in January 2015. On July 7, 2015, shortly before Ms. Meade returned to work from disability leave, she emailed Mr. Johnston regarding "open questions" she had for him and for HR. (Johnston Depo., Doc. 63-2, Ex. 3.) Ms. Meade inquired in the email what the current policy was for her regarding sick time, how many vacation days did she have remaining for 2015, and whether a Performance Improvement Plan remained in effect for her and when it was scheduled to end. She also asked for a copy of the Performance Improvement Plan. She concluded the email by stating, *1266 "I would like to propose that we start again with a clean slate. If that is not possible, I would like some direction on what processes I need to be following." (Id. ) On July 8, 2015, Mr. Johnston replied to the email by telling Ms. Meade that she had 8.5 vacation days left in 2015 according to his records. He copied Chris Castillo, the Human Resources Business Partner overseeing a team of employees that included Plaintiff, on his reply email to Ms. Meade. Mr. Johnston asked Ms. Castillo to address Ms. Meade's other questions in his reply email.
On July 22, 2015, Ms. Castillo emailed Ms. Meade and Mr. Johnston. (Johnston Depo., Doc. 63-2, Ex. 4.) Ms. Castillo advised Ms. Meade to call GM Benefits and Services every time she needed to take an absence related to her condition, and that she should call Sedgwick (the claims processor) daily to report her half day absences. Ms. Castillo stated, "[Y]ou have to call in every day you are utilizing FMLA." (Id. ) Additionally, in response to Ms. Meade's request for a "clean slate," Ms. Castillo stated, "The decision to honor your proposal has been made. Your prior Performance Improvement Plan (PIP) has been closed and we are starting again with a clean slate." (Id. ) Ms. Meade met with Mr. Johnston and Ms. Castillo around the time of Ms. Castillo's email on July 22, 2015.
Following the July 22, 2015 email and the meeting on or around this time, Ms. Meade testified that she understood that " 'clean slate' ... related to all employment issues, including any past performance issues and discipline, attendance and leave issues, and the previous Performance Improvement Plan." (Meade Declaration, Doc. 70-2 ¶ 3.) She also testified that either Mr. Johnston or Ms. Castillo told her she was being given a "fresh start" during the meeting. (Meade Depo., Doc. 60 at 69.) For his part, Mr. Johnston testified that he interpreted the "clean slate" reference to mean "a clean slate of history, of everything." (Johnston Depo., Doc. 63-2 at 157.) He further stated that the "clean slate" did not just refer to Ms. Meade's Performance Improvement Plan. (Id. ) During Ms. Castillo's deposition, when asked whether a "clean slate" was regarding "the past issues of [Ms. Meade] not following instructions and performance and whatever else was in her past regarding employment," Ms. Castillo answered that this was correct. (Castillo Depo., Doc. 61 at 18-19.) Ms. Castillo clarified that "clean slate" did not necessarily refer to the consequences of Ms. Meade's past issues, but just that "she was going to be given yet another opportunity to make things work with GM." (Id. at 20.) Defendant disputes that the "clean slate" referred to anything beyond Plaintiff's Performance Improvement Plan, such as her prior absences.
Ms. Meade returned to work in July 2015, and she continued to request and take intermittent FMLA in the weeks and months that followed due to her migraines. From August 1, 2015 to her termination on December 18, 2015, Ms. Meade was absent from work for approximately 47 days - 29 of which were for approved or unapproved FMLA leave. (Johnston Depo., Doc. 63-2, Ex. 22.)
At one point after Ms. Meade returned to work, Mr. Johnston discussed Ms. Meade's absences with her and told her that he could not provide her with meaningful work. (Johnston Depo., Doc. 63-1 at 116-19.) Mr. Johnston reported the same thing to Christine Clark in Human Resources. Ms. Clark had replaced Ms. Castillo in October 2015 as the Human Resources Business Partner overseeing Plaintiff and other employees in her team. (Castillo Depo., Doc. 61 at 34.) Mr. Johnston *1267 testified about his conversation with Ms. Clark as follows:
Q: And your testimony is you used the phrase meaningful work to Ms. Clark?
A: I'm trying to think of the exact term. It was the same terminology that I gave Amber. It was to the effect that, you know, because it's so intermittent I can't really give you high priority things, things that are gonna take a long time so it's just kind of the smaller tasks.
Q: What did you mean because it's so intermittent?
A: The migraines.
Q: Okay. Because of the intermittent FMLA leave she was taking?
A: Yeah.
Q: Because of that you couldn't provide her meaningful, what you thought was meaningful tasks?
A: Yeah. I wanted to get her on a project.
Q: Right. But what you thought was interfering with that was her use of intermittent FMLA?
A: Not her use of it. It's just the fact she wasn't at work.
Q: Right. Because of the migraines?
A: Yes.
Q: And her using intermittent FMLA?
A: Yes.
(Johnston Depo., Doc. 63-1 at 118-19.)
On December 9, 2015, Mr. Johnston emailed Ms. Clark regarding Ms. Meade's performance. He included a "deliverable tracker spreadsheet" in his email. (Johnston Depo., Doc. 63-2, Ex. 17.) The spreadsheet shows 18 deliverables assigned to Ms. Meade. Of the 18 deliverables, the spreadsheet shows that she had completed half. Of the remaining half she had not completed, 5 of them were reassigned to other employees on the team, 2 were cancelled, and 2 were still pending completion. (Id. ) During his deposition, Mr. Johnston testified that he had to re-assign some of Ms. Meade's work to other employees because she was absent while exercising her FMLA intermittent leave. He explained that he kept work assigned to her "until the deliverable started getting hot and we had to reassign it." (Id. at 162.) He also testified that of the work Ms. Meade completed - the 50 percent of the total work assigned to her - only 60 percent of it was satisfactory. (Id. at 153-54.)
From July through December 2015, Mr. Johnston approved all of the non-FMLA leave requested by Ms. Meade. He did not discipline her for absences during this time. (Meade Declaration, Doc. 70-2 ¶ 5.)
C. Ms. Meade's Reporting of FMLA Leave
On July 22, 2015, in her email to Ms. Meade and Mr. Johnston, Ms. Castillo told Ms. Meade that "you should be contacting Sedgwick daily to report your half day absences." She further stated, "The FMLA process is the same as your other claim," and that "you have to call in every day you are utilizing FMLA." (Johnston Depo., Doc. 63-2, Ex. 4.) Around the same time, Ms. Castillo told Ms. Meade during a conversation that Ms. Meade should also report her FMLA absences to her supervisor, Mr. Johnston. (Meade Declaration, Doc. 70-2 ¶ 4.)
The parties dispute whether Ms. Meade complied with GM's FMLA reporting requirements after July 2015. Ms. Meade states in her declaration that she reported her FMLA absences to both Sedgwick and Mr. Johnston each day she took FMLA leave. (Meade Declaration, Doc. 70-2 ¶ 4.) According to Mr. Johnston, however, he noted in his spreadsheet eight different instances (for a total of nine days) after July 2015 in which Ms. Meade's absences were not approved as FMLA leave. Four *1268 of the eight instances included this description: "FMLA requested and denied due to failure to report FMLA in a timely manner." The other four instances included either of these descriptions: "No FMLA requested per Sedgwick" and "FMLA requested but denied due to failure to provide certification." (Johnston Depo., Doc. 63-2, Ex. 22.)
Additionally, Ms. Clark testified that Ms. Meade was required to contact Sedgwick each day - specifically by 3:30 P.M. - to report an FMLA absence. (Clark Depo., Doc. 62-2 at 139.) Ms. Clark used Mr. Johnston's spreadsheet and added notes to it based on her phone calls with Sedgwick regarding Ms. Meade's absences. Ms. Clark concluded from her conversations with Sedgwick that Ms. Meade had failed to properly report her FMLA absences to Sedgwick for 16.5 days during the period of January 1, 2015 through December 7, 2015.[2]
Natalie Davis at Sedgwick contacted Ms. Meade on November 24, 2015 regarding the requirements of reporting her FMLA leave, including reporting leave every day by 3:30 P.M. (Pl.'s Response, Docs. 70-12, 70-13, Exs. 11-12.) Ms. Meade claims this was the first time she had heard about the 3:30 P.M. reporting requirement since July 2015 - when Ms. Castillo originally instructed her on reporting FMLA leave. According to Ms. Meade, she attempted to contact Ms. Clark to discuss concerns about this 3:30 P.M. requirement, but Ms. Clark did not respond. (Meade Declaration, Doc. 70-2 ¶ 8.)
D. Investigation of Ms. Meade's Company
At the time Ms. Meade started working at GM, she owned a company named Professional Geek, LLC (hereinafter referred to as "PG"). Ms. Meade disclosed this fact to GM in 2014 and 2015 pursuant to GM's Conflict of Interest policy, which requires employees to disclose possible conflicts. In June 2015, Ms. Meade disclosed to GM that no active work was being performed by PG and that she was in the process of closing the company. (Myers Declaration, Doc. 58-3 at 12.) On June 30, 2015, GM informed Ms. Meade that her disclosure of a potential conflict with PG was "resolved." (Pl.'s Response, Doc. 70-20, Ex. 36.)
Several months later, in October 2015, Ms. Clark independently decided to research Ms. Meade on the internet. Ms. Clark looked up Ms. Meade's LinkedIn page, which identified Ms. Meade as the present owner of PG. During her deposition, when asked what caused her to check Ms. Meade's LinkedIn page, Ms. Clark responded, "The attendance. We've - I've seen it before where employees have that type of attendance and have a secondary business." (Clark Depo., Doc. 82-1 at 91.) Ms. Clark became concerned that Ms. Meade was running her own business based on the LinkedIn page. Ms. Clark also looked to see if there was a website for PG and did not recall finding one. (Id. at 115.) Ms. Clark reached out to her friend Jason Knapp, who was not a GM employee, and asked him to take a screen shot of Ms. Meade's LinkedIn page since she was having difficulty doing so herself. (Id. at 90.) Ms. Meade requested the *1269 screen shot because she felt she "needed to open the investigation" into Ms. Meade. (Id. ) On October 29, 2015, Mr. Knapp emailed her the screen shot. (Pl.'s Response, Doc. 70-16, Ex. 16.) That same day, Ms. Clark also contacted another GM employee and asked to see all of Ms. Meade's conflict-of-interest disclosures, which the employee promptly emailed her. (Id. , Doc. 70-17, Ex. 28.)
On November 18, 2015, Ms. Clark emailed Sharon Ridgell, the Senior HR Policy Consultant at GM. Ms. Clark requested a "forensic review" of Ms. Meade's computer, conducted remotely, to determine whether Ms. Meade was "using her GM equipment to conduct business for her consulting company." (Id. ) The following day, Ms. Ridgell passed along the forensic review request to an employee of GM's Global Security Investigations division. (Id. ) She also informed the HR Director of Information Technology about the forensic review request, stating: "This is the case I mentioned to you this morning. We started down the road of abuse of FMLA (Family Medical Act/migraine headaches)." (Id. )
Subsequently, Ms. Clark selected the dates that Ms. Meade had taken FMLA and provided them to Ryan Kane, the lead investigator regarding Ms. Meade's computer. Ms. Clark instructed Mr. Kane to use only these dates when investigating whether Ms. Meade was improperly using her GM computer. (Pl.'s Response, Doc. 70-18, Ex. 32.) On December 16, 2015, Steven Day, who worked with GM's Global Security division, emailed Ms. Ridgell and others (and copied Mr. Kane) to inform them that the forensic review had been completed. He stated in the email: "My assessment of the previous investigation still stands by the determination that the GM assets are not being used to support [Ms. Meade's] personal business." (Pl.'s Response, Doc. 70-21 at 67, Ex. 38.) Ms. Ridgell forwarded Mr. Day's email to Ms. Clark the same day.
E. Denial of Ms. Meade's Requested Leave in December and Events Surrounding Her Termination
Ms. Clark spoke with Ms. Ridgell regarding employment issues with Ms. Meade on a number of occasions. (Ridgell Depo., Doc. 84 at 34, 56.) At some point, Ms. Clark recommended to Ms. Ridgell that Ms. Meade be terminated due to "attendance, subpar work or performing of work was unsatisfactory, failure to comply with the FMLA process, and integrity in regards to providing information about her business." (Id. at 35.) Based on her position in HR, Ms. Clark could only make a recommendation of termination. Ms. Ridgell was responsible for ultimately approving all termination decisions. (Id. at 13.)
On December 2, 2015, Ms. Clark emailed Mark Anthony Johnson (GM's HR Director) and copied Ms. Ridgell and others regarding "the completed case template for Amber Meade." (Pl.'s Response, Doc. 70-21 at 54, Ex. 38.) The email states that Ms. Ridgell and Ms. Georgell - an attorney in GM's office of general counsel - support an immediate termination of Ms. Meade for the following reasons:
• Amber is unreliable. She cannot be trusted to be given projects commensurate with a 7th level.
• Her performance is erratic.
• Under the conflict of interest, she had indicated that she was closing her business however we have strong doubts that is the case.
• Amber has consistently failed to follow the FMLA reporting procedures and we cannot be tolerant any further.
(Id. )
In her deposition, Ms. Clark expounded upon the reasons for terminating Ms. *1270 Meade outlined in her December 2nd email. Ms. Clark explained that she based the first two bullet points on her discussions with Mr. Johnston, Ms. Meade's manager. With respect to the first bullet, Mr. Johnston would assign Ms. Meade work, and "when it came time to delivering, ... the work wasn't at the state he necessarily thought it was, it wasn't in the quality we expected, and it was causing us ... to have to reassign and shuffle the work." (Clark Depo., Doc. 82-2 at 184-85.) She further testified: "It wasn't just not being there. It was ... assessments of the state of the work, where it was, what needed to be done." (Id. at 185.) With respect to the second bullet, Ms. Clark stated that Mr. Johnston could not assign her projects commensurate with her level of employment "because not only, again, did we have erratic attendance, but when she was out, the work wasn't - we didn't have accurate assessments of where the work was, where the projects were." (Id. at 186.) Ms. Clark understood Mr. Johnston to have counseled Ms. Meade about "her performance being erratic" but not formally disciplining her. (Id. at 188.)
On December 10, 2015, Ms. Meade emailed Mr. Johnston and told him she was "contacting Benefits today to see about taking some time off." (Pl.'s Response, Doc. 70-14, Ex. 13.) She said she needed to take a break to get healthy and that she "can't keep up like this." (Id. ) She requested approximately thirty days of leave, both under GM's short-term disability plan (paid leave) and FMLA (unpaid leave). (Meade Depo., Doc. 60 at 165-66.) Because GM provided for paid holidays for about two weeks during this time period, Ms. Meade's leave request actually amounted to about two work weeks. (Id. ; Meade Decl., Doc. 70-2 ¶ 12.)
On December 14, 2015, Ms. Clark, Ms. Ridgell, and Ms. Georgell had a conference call with John Myers regarding Ms. Meade. (Clark Depo., Doc. 82-1 at 105-06.) Mr. Myers is a GM employee who oversees questions relating to GM's FMLA program and short-term and long-term disability plans. (Myers Declaration, Doc. 58-3 ¶ 3.) Mr. Myers testified that he received a "tip" from Ms. Clark that Ms. Meade was engaged in outside employment. (Myers Depo., Doc. 69-1 at 15.) She sent him a snapshot of Ms. Meade's LinkedIn page and a copy of Ms. Meade's conflict of interest form.
The same day, Mr. Myers emailed an employee of Sedgwick, the claims processor, about the call. Mr. Myers stated that Ms. Meade "is facing employment action due to excessive absenteeism" and that she also "operat[es] an outside consulting company." (Pl.'s Response, Doc. 70-21 at 59, Ex. 38.) He further stated that his Benefits division was "taking immediate action to deny this claim from the onset." (Id. ; see also Myers Depo., Doc. 69-1 at 28-29.) He then asked the Sedgwick employee to look into Ms. Meade's purported business and advise whether it is still "an ongoing entity." (Id. )
On the morning of December 15, 2015, the Sedgwick employee emailed Mr. Myers regarding Ms. Meade's purported business, PG. He told Mr. Myers that he located the filing for Ms. Meade's business with the State of Georgia, where it is still listed as an active business. He also advised that the business "has yet to file the 2015 annual report/filing" and "[t]here does not appear to be an active website/business listing for the company," though "there are a couple of other internet hits indicating that the business might still be active." (Pl.'s Response, Doc. 70-21 at 58, Ex. 38.) Mr. Myers forwarded this email to Ms. Clark, Ms. Ridgell, and Ms. Georgell that afternoon.
*1271 A few hours after Mr. Myers's email to the HR staff, a Sedgwick employee emailed Ms. Clark a copy of the Disability Salaried Personnel Form and a copy of the denial letter regarding Ms. Meade's December 10th leave request. (Pl.'s Response, Doc. 70-19, Ex. 34.) The Disability Salaried Personnel Form, dated December 15, 2015, states: "S & A[3] claim denied due to Salaried Outside Employment." (Id. ) Additionally, the denial letter is dated December 15, 2015, and it provided the following reasoning for denying Ms. Meade's leave request:
We received additional information that reflects you are participating in outside employment activities while on disability, as Principal and Owner of Professional Geek, LLC. Consequently, you are considered to be engaging in regular employment for remuneration or profit. As a result, you are deemed ineligible for Sickness and Accident benefits under the Plan.
Therefore, based on all the information in your claim file, as you were engaged in regular employment during the period you were entitled to receive Sickness and Accident benefits; and you did not remain continuously disabled under the terms of the Program, we are unable to approve Sickness and Accident benefits from December 14, 2015.
(Pl.'s Response, Doc. 70-22, Ex. 39.) Ms. Clark also contacted Ms. Meade on December 15, 2015, notifying her that her leave request had been denied and that future leave requests would be denied.
The following day, December 16th, Ms. Meade met with Mr. Johnston, Ginger Schroeder (a Senior HR Business Partner at GM), and Ms. Clark, who joined by phone. Ms. Clark suspended Ms. Meade. She also discussed the following topics: Ms. Meade's failure to follow the process for reporting her FMLA leave, difficulty assigning her work due to her absences, and Ms. Meade's potential outside business of Professional Geek, LLC. (Meade Depo., Doc. 60 at 510-514, Ex. 15; Meade Depo., Doc. 60 at 141.) Ms. Clark asked Ms. Meade to produce records establishing that she was not currently running another business and did not have salaried outside employment. (Id. , Doc. 60 at 513, Ex. 15.) In particular, Ms. Clark asked Ms. Meade to produce tax statements, accounts receivable and payable, a list of clients, and invoicing (i.e., how much time she spent on certain accounts) to satisfy this inquiry. (Id. at 136-37; id. , Doc. 60 at 510-514, Ex. 15.) In contrast, Ms. Meade testified that Ms. Clark told her to present documents to prove that she "did not have salaried outside employment." (Meade Depo., Doc. 60 at 136.)
Later that same day, Ms. Meade emailed Ms. Clark and Mr. Johnston the following documentation: a business search from the Georgia Secretary of State's Corporations Division (showing the business was not registered in 2015), a 2014 Schedule C tax form (showing no reported income in 2014), and a statement balance for a business checking account as of November 30, 2015 (showing no activity in 2015). (Id. , Doc. 60 at 515-20, Ex. 16.)
On December 18, 2015, Ms. Meade again met with Mr. Johnston, Ms. Schroeder, and Ms. Clark. They informed Ms. Meade that her employment with GM was terminated. Ms. Clark told Ms. Meade that she could not do the basic functions of the job and that she had been disingenuous about her business, as the documents she had produced were not enough to prove she was not running her business. (Id. , Doc. 60 at 510-514, Ex. 15.)
*1272 F. COBRA Notification
After Ms. Meade's termination, Ms. Ridgell initially categorized her termination as based on "gross misconduct." (Ridgell Depo., Doc. 84-1 at 78-79.) Ms. Ridgell made this decision jointly with Ms. Clark. Ms. Ridgell considered the gross misconduct to be Ms. Meade's issues with attendance, compliance with FMLA procedure, performance, and providing documentation regarding her business. (Id. ) Because of this "gross misconduct" categorization, Ms. Meade was initially denied COBRA benefits.[4] Ms. Meade received a notice in the mail approximately two weeks after she was terminated informing her that she was being denied COBRA benefits. (Meade Depo., Doc. 60 at 158-59.)
On February 3, 2016, Ms. Meade's attorney emailed Ms. Schroeder in HR with the subject line "Amber Meade Confidential Settlement Communication." (Pl.'s Response, Doc. 70-23 at 12, Ex. 40.) Ms. Schroeder forwarded this message on to Ms. Ridgell and Ms. Clark. On February 15, 2016, Ms. Clark emailed Ms. Ridgell, Ms. Schroeder, and Ms. Georgell the following message, which is addressed to Ms. Georgell:
Hello Holly,
The denial of COBRA was based on her termination code. You had suggested we use this as a bargaining chip so she was coded such that she was ineligible for COBRA. This decision was made during that final meeting before termination that included Mark Johnson and Linda Deskins.
Thank you,
Christine
(Id. at 10.) During her deposition, Ms. Clark explained that the denial of COBRA benefits was "something we negotiate" and that "if Amber was upset about it, we could convert the code, but the coding was done consistent with the time fraud." (Clark Depo., Doc. 83-2 at 212-13.) Ms. Ridgell gave similar testimony during her deposition. When asked if Ms. Meade's termination was classified as "gross misconduct" as a bargaining chip, meaning it could be changed to "eligible" if Ms. Meade "came back and appealed anything," Ms. Ridgell answered, "We do that in a number of instances." (Ridgell Depo., Doc. 84-1 at 82.) Ms. Ridgell also maintained, as Ms. Clark did, that Ms. Meade's termination was correctly coded as "gross misconduct" from the start. Ms. Georgell, on the other hand, testified that she never recalled telling Ms. Clark to deny Ms. Meade COBRA benefits as a bargaining chip. (Georgell Depo., Doc. 70-8 at 74-75.)
On March 3, 2016, Cynthia Agosta - a Health Care and Operations Administrator at GM - sent an email stating that Ms. Meade's termination should be manually changed from a "gross misconduct" coding to a "discharge" coding. (Meade Depo., Doc. 82-5 at 20, Ex. 37.) Ms. Agosta sent this email after Ms. Clark emailed her earlier that day with the subject line stating "Amber Meade" and "Correct a transaction." (Id. at 20-21.) Ms. Agosta further instructed in the email that a COBRA kit should be sent to Ms. Meade as soon as possible. (Id. at 20.) GM sent Ms. Meade the COBRA kit on or around March 7, 2016. Ms. Meade had already found independent coverage by that time, so she did not sign up for COBRA benefits.
II. Legal Standard
This Court may grant summary judgment only if the record shows "that there *1273 is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome under the governing law. Id. The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. Id. at 249, 106 S.Ct. 2505.
When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. Reeves v. Sanderson Plumbing Prods., Inc. , 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. Celotex Corp. v. Catrett , 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. Id. at 324-26, 106 S.Ct. 2548. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson , 477 U.S. at 251-52, 106 S.Ct. 2505.
III. Discussion
Defendant moves for summary judgment on all four counts against it: ADA discrimination, FMLA interference, FMLA retaliation, and ERISA/COBRA violation.
A. ADA Discrimination (Count 4)
Plaintiff rests her ADA claim solely on circumstantial as opposed to direct evidence of discrimination. Thus, the Court examines her claim under the familiar McDonnell Douglas burden-shifting framework. See generally McDonnell Douglas Corp. v. Green , 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ; see also Cleveland v. Home Shopping Network, Inc. , 369 F.3d 1189, 1193 (11th Cir. 2004) (applying McDonnell Douglas burden-shifting to an ADA discrimination claim). Under this framework, Plaintiff bears the initial burden of establishing a prima facie case of discrimination. Id. "To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) [s]he is disabled; (2) [s]he is a qualified individual; and (3) [s]he was subjected to unlawful discrimination because of h[er] disability." Holly v. Clairson Indus., L.L.C. , 492 F.3d 1247, 1255-56 (11th Cir. 2007). It is undisputed that Plaintiff has a disability. Defendant challenges the other two prongs of Plaintiff's prima facie case.
The Court first examines whether Plaintiff was a "qualified individual" at the time she was terminated. The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In other words, "an ADA plaintiff must show either that he can perform the essential functions of his job without accommodation, or, failing that, ... that he can perform the essential functions of his job with a reasonable accommodation." Holly v. Clairson Indus., L.L.C. , 492 F.3d 1247, 1256 (11th Cir. 2007) (quoting *1274 D'Angelo v. ConAgra Foods, Inc. , 422 F.3d 1220, 1229 (11th Cir. 2005) (superseded by statute on other grounds) ).
Defendant argues that Plaintiff fails to establish her ADA claim because she is not a "qualified individual." More specifically, Defendant argues that Plaintiff was not qualified to do her job based on her absenteeism, which in turn caused her work to be unsatisfactory. Defendant relies in part on the decision in Robinson v. Fulton Cty., Ga. , which states: "Courts have consistently held that the ability to be present on the job and to complete all assigned tasks within a reasonable period of time is essential to any job." No. 1:05-CV-2250-RWS, 2008 WL 78711, at *22 (N.D. Ga. Jan. 4, 2008). Applying this principle to the present case, Defendant points to the fact that Plaintiff missed approximately 152 days of work in 2015 (i.e., 58 percent of work days that year). Defendant also points to the testimony of Plaintiff's supervisor, Mr. Johnston, regarding Plaintiff's inability to properly complete her work due to her absences. According to Defendant, "Plaintiff quite simply did not come to work and do her job often enough to be qualified," and therefore "she is not protected by the ADA." (Def.'s Motion, Doc. 58-1 at 9.)
Relatedly, Defendant argues that Plaintiff's request for more leave in December 2015 was not a reasonable one, as "there is no evidence that it would have allowed her to perform the essential functions of her job upon her return." (Id. at 10.) Defendant points to the lack of evidence that Plaintiff's migraines or depression would have improved, or that she would have been able to attend work more regularly, after taking this December leave.
Plaintiff counters that "she could perform the essential functions of the job with a reasonable accommodation - medical leave of a definite duration."[5] (Pl.'s Response, Doc. 72 at 5.) Plaintiff asserts that her request for thirty days of leave in December - which actually equated to only two weeks of leave in light of GM's paid vacation during the holidays - was reasonable. It was a relatively short amount of time and had a "specific date of return." (Id. at 9.) She further argues that this case is distinguishable from Robinson. In Robinson , Plaintiff asserts, the undisputed *1275 evidence showed that the plaintiff had "unexcused absences and numerous counseling memorandums and written warnings" before she was terminated. (Pl.'s Response, Doc. 72 at 6.) Plaintiff contrasts the current case by pointing to the "clean slate" discussion in July 2015, which guaranteed Plaintiff a "fresh start" regarding all employment issues. After July 2015 up to her termination, she argues that no disciplinary actions were taken against her, her leave requests were not denied, and there was a general lack of documentation showing that she could not perform the essential functions of her job. Plaintiff emphasizes that it was not unusual for Mr. Johnston to reassign work to employees and that "[d]eadlines were normally soft deadlines." (Id. at 7.) Plaintiff thus contends that the evidence shows GM sought to terminate her "based on her FMLA absences [ ] which are directly related to her disability," not based on her inability to do her job. (Id. at 8.)
First off, neither side disputes which functions are essential or not in Plaintiff's former job. Defendant cites to Robinson to define what is generally considered essential - "the ability to be present on the job and to complete all assigned tasks within a reasonable period of time" - and Plaintiff does not take issue with this statement in her Response brief. 2008 WL 78711, at *22 (citing to Rogers v. Int'l Marine Terminals, Inc. , 87 F.3d 755, 759 (5th Cir. 1996) ; Tyndall v. National Educ. Centers, Inc. , 31 F.3d 209, 213 (4th Cir. 1994) ; Jackson v. Veterans Admin. , 22 F.3d 277, 278-279 (11th Cir. 1994) ). Moreover, Robinson is not alone in stating this general principle. See, e.g., Jackson v. Veterans Admin. , 22 F.3d 277, 279 (11th Cir. 1994) ("Because Jackson was absent numerous times within the first few months of his probationary employment on a sporadic, unpredictable basis, he could not fulfill this essential function of his employment, that of being present on the job, and was not otherwise qualified."); Tyndall v. Nat'l Educ. Centers, Inc. of California , 31 F.3d 209, 213 (4th Cir. 1994) ("[A] regular and reliable level of attendance is a necessary element of most jobs."); Waggoner v. Olin Corp. , 169 F.3d 481, 484 (7th Cir. 1999) (same); Paleologos v. Rehab Consultants, Inc. , 990 F.Supp. 1460, 1467 (N.D. Ga. 1998) (same); Allen v. GTE Mobile Commc'ns Serv. Corp. , No. 1:95-CV-463-MHS, 1997 WL 148670, at *3 (N.D. Ga. Feb. 26, 1997) (same); Walders v. Garrett , 765 F.Supp. 303, 310 (E.D. Va. 1991), aff'd , 956 F.2d 1163 (4th Cir. 1992) ("It is self-evident that while perfect attendance is not a necessary element of all jobs, reasonably regular and predictable attendance is necessary for many.").
The Court also recognizes that, when assessing which job functions are essential or not, it must account for the actual requirements of the job at issue. And the Court has done so here. See Jackson , 22 F.3d at 278-79 ; Davis v. Fla. Power & Light Co. , 205 F.3d 1301, 1305 (11th Cir. 2000) ("Whether a function is essential is evaluated on a case-by-case basis...."). In particular, Plaintiff testified about her job being somewhat flexible in allowing her to work from home at times instead of being physically present at the office. (Meade Depo., Doc. 60 at 112, 197.) This flexibility about her work location, however, does not appear to impact the assessment of Ms. Meade's ability to perform her job. For instance, Ms. Meade denies that her ability to work remotely or from home is even a material fact in this case. (Pl.'s Responses to Def.'s SOMFs, Doc. 85 ¶ 61.) The Court further notes that Ms. Meade did not frame her request for a reasonable accommodation as seeking more flexibility in her work location; she just framed her request as seeking more leave.
*1276 Thus, the Court turns to Plaintiff's argument that her request for more leave was reasonable and that, at the very least, the evidence is disputed as to whether she could perform the essential functions of her job with that reasonable accommodation.
Under the ADA, an employer must make reasonable accommodations to an otherwise qualified employee with a disability, unless doing so would impose undue hardship on the employer. Frazier-White v. Gee , 818 F.3d 1249, 1255 (11th Cir. 2016). "An accommodation is only reasonable if it allows the disabled employee to perform the essential functions of the job in question." Id. In other words, "[i]f the individual is unable to perform an essential function of his ... job, even with an accommodation, he is, by definition, not a qualified individual and, therefore, not covered under the ADA." D'Angelo v. ConAgra Foods, Inc. , 422 F.3d 1220, 1229 (11th Cir. 2005) (internal quotations omitted). "What constitutes a reasonable accommodation depends on the circumstances, but it may include ... part-time or modified work schedules ... among other things." Frazier-White , 818 F.3d at 1255. "The employee has the burden of identifying an accommodation and demonstrating that it is reasonable." Id.
As the Court views the evidence in the light most favorable to the non-moving party, Plaintiff, the Court treats the "clean slate" conversation as erasing Plaintiff's attendance and performance issues before July 2015 and giving her a "fresh start." (Meade Declaration, Doc. 70-2 ¶ 3.) From August 1, 2015 until her termination in December 2015, Plaintiff was absent for approximately 47 days of the 100 total work days. She did not take all 47 days off at once either; she took time off at irregular intervals depending on her medical issues. As to her performance during this period, Mr. Johnston testified that he told Ms. Clark he could not give Plaintiff "meaningful" work due to her absences. Mr. Johnston also emailed Ms. Clark on December 9, 2015, including a spreadsheet summarizing the deliverables assigned to Plaintiff and her progress on each. The spreadsheet showed that Plaintiff had only completed half of her deliverables, and of that half, she had only completed 60 percent satisfactorily. Mr. Johnston had to reassign about a third of the total deliverables originally assigned to Plaintiff. Additionally, Mr. Johnston testified that he told Plaintiff the same thing he told Ms. Clark earlier: he could not give her "meaningful" work because of her absences. Plaintiff disputes that this conversation between her and Mr. Johnston took place; she states in her declaration that "Mr. Johnston never indicated that my leave rendered me unable to perform the essential duties of my job or that my performance was unsatisfactory." (Meade Declaration, Doc. 70-2 ¶ 5.)
Even when the evidence is viewed in the light most favorable to Plaintiff, she has not carried her burden of establishing that her request for more leave in December was reasonable. This is because she has not shown that she would be able to perform the essential functions of her job with this accommodation of thirty more days of leave. The undisputed fact is that, up until the point she made this leave request, Plaintiff missed roughly half of the total work days from August to December 2015. Unsurprisingly, the undisputed evidence also shows that her performance suffered due to these absences. Plaintiff may dispute the fact that Mr. Johnston told her he could not assign her meaningful work, but regardless, she was aware that he had to reassign several of her assignments as she continued to take time off. She knew that she was generally expected to complete *1277 her assignments, and she admits that her absences "had a negative impact" on her ability to execute those assignments "on time and complete." (Meade Depo., Doc. 60 at 107.) Notably, Plaintiff has not presented any evidence showing that this situation would improve after she returned from her requested leave. She has not shown, for instance, that her migraines or depression would improve or that she would be able to attend work more regularly. See Paleologos , 990 F.Supp. at 1467 ; Jackson , 22 F.3d at 279.
The Eleventh Circuit's decision in Jackson v. Veterans Administration is illustrative. 22 F.3d 277 (11th Cir. 1994). There, the Veterans Administration ("VA") terminated Mr. Jackson, who was hired as a housekeeping aide, for excessive absences. Id. at 278. He had used up all of his annual leave during his first three months of employment mostly due to his rheumatoid arthritis. Id. The lower court noted that Mr. Jackson's performance "was fully satisfactory in all respects except attendance" and that he "only used time allotted to him." Id. at 279 ; Jackson v. Adm'r of Veterans Affairs, Veterans Admin. , No. CIV. A. 92-AR-0521-S, 1993 WL 719626, at *1 (N.D. Ala. Apr. 27, 1993). The record does not show that the VA denied his leave requests, issued any warnings, or disciplined him about attendance before terminating him. Jackson , 1993 WL 719626, at *1. In fact, the VA instructed him to go home at one point and "count the day as an annual leave day." Id. Ultimately, the Eleventh Circuit agreed with the lower court's conclusion that Mr. Jackson was not a "qualified individual" - solely based on the fact that the job required his "presence on a routine basis" and that he was unable to satisfy this requirement given his numerous absences "on a sporadic, unpredictable basis." Jackson , 22 F.3d at 279 ("The district court correctly held that it was apparent that this temporary employee could not report to work consistently, a necessary part of the particular job he was hired to do.").
In short, based on the undisputed evidence viewed in her favor, Plaintiff has not shown she was a "qualified individual" at the time of her termination or that Defendant denied her request for a reasonable accommodation that would have allowed her to perform the position requirements.[6] There is no fact issue for the jury to resolve on this point. Plaintiff therefore fails to satisfy her initial burden of establishing a prima facie case of discrimination, and the Court need not examine whether Defendant subjected her to unlawful disability discrimination. See Paleologos , 990 F.Supp. at 1468 ; Jordan v. City of Union City, Ga. , 646 F. App'x 736, 741 (11th Cir. 2016) ("Because Jordan must show that he is a qualified individual to proceed under the ADA, we do not address his remaining arguments, such as the legitimacy of Union City's reasons for his termination."). The Court GRANTS summary judgment to Defendant on Plaintiff's ADA claim.
B. FMLA Interference (Count 1)
The FMLA entitles eligible employees to twelve workweeks of unpaid leave during any twelve-month period due to a serious health condition that makes the employee unable to work. 29 U.S.C. § 2612(a)(1)(D). One type of claim under the FMLA is an interference claim, "in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act."
*1278 Strickland v. Water Works & Sewer Bd. of City of Birmingham , 239 F.3d 1199, 1206 (11th Cir. 2001). "To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." Id. at 1206-07.
Defendant argues that Plaintiff cannot prove FMLA interference because, by the time she requested additional leave in December 2015, she had already exhausted her entitlement to twelve weeks (i.e., 60 work days) of FMLA leave. Specifically, she had actually taken off 118 days of work by that point, meaning Defendant had already granted her more leave than she was entitled to under the FMLA. Defendant cites to case law supporting its position that the FMLA does not guarantee more than twelve weeks of leave, so once that leave is exhausted, an employee cannot show he or she was denied a benefit under the law.
In response, Plaintiff argues she has clearly established her interference claim "because GM terminated her in violation of her substantive FMLA rights by relying on FMLA absences to terminate her." (Pl.'s Response, Doc. 72 at 16.) Plaintiff cites to a Ninth Circuit decision, a Middle District of Tennessee decision, and a Northern District of Ohio decision to support this argument. Additionally, Plaintiff points out that she was still entitled to FMLA benefits in December 2015 as she "was on FMLA intermittent leave immediately prior to her termination." (Id. at 18.) She further emphasizes that Sedgwick had already extended her intermittent leave through March 2016 before she was terminated.
In McGregor v. Autozone, Inc. , the Eleventh Circuit makes clear that "[t]he [FMLA] statute does not suggest that the 12 week entitlement may be extended." 180 F.3d 1305, 1308 (11th Cir. 1999). The Eleventh Circuit used this reasoning, in part, to find that certain regulations were invalid and unenforceable because they had the effect of "grant[ing] entitlements beyond those of the statute" - i.e., extending FMLA leave beyond the allotted 12 weeks. Id. Accordingly, the Eleventh Circuit stated that, "[w]here an employer such as defendant exceeds the baseline 12 weeks by providing not only more leave than FMLA but also paid leave, the employer should not find itself sued for violating FMLA." Id.
In Penaloza v. Target Corp. (an unpublished decision), the Eleventh Circuit applied McGregor to the plaintiff's interference claim:
As to interference, Target gave Ms. Penaloza over 12 weeks of leave before her termination. She was terminated two weeks after her 12-week leave period ended. Thus, Penaloza cannot show that she was denied any benefit to which she was entitled under the FMLA.
549 F. App'x 844, 848 (11th Cir. 2013). In a footnote, the Eleventh Circuit also noted that Target had a policy of providing employees 16 weeks of unpaid leave - over the statutory requirement - if the employees timely completed their FMLA forms. "This voluntary policy," the court held, "could not form the basis of an FMLA claim, which has a fixed statutory requirement of 12 weeks." Id. at 848 n.1 (citing to McGregor , 180 F.3d at 1308 ).
The Eleventh Circuit and district courts within it have applied the same reasoning in Penaloza to other interference claims. See, e.g., Jones v. Gulf Coast Health Care of Delaware, LLC , 854 F.3d 1261, 1268 (11th Cir. 2017) ("Relevant caselaw suggests that an employer does not interfere with an employee's right to reinstatement if that employee is terminated after taking leave in excess of the 12 weeks permitted *1279 by the FMLA."); Giles v. Daytona State Coll., Inc. , 542 F. App'x 869, 874-75 (11th Cir. 2013) ("[T]he district court properly granted summary judgment to Daytona State on Giles's FMLA interference claim. The record confirms that Giles used all of her available FMLA leave on June 22, 2009, and thus, there is no evidence that she was denied an FMLA benefit to which she was entitled."); Odum v. Dolgencorp, LLC , No. 4:14-CV-0151-HLM, 2015 WL 12697644, at *2 (N.D. Ga. Sept. 9, 2015) (adopting Magistrate Judge's recommendation and finding that "Plaintiff has no interference claim because he received all of the FMLA benefits (i.e., twelve weeks of leave) to which he was entitled.") (internal quotations omitted). Furthermore, Plaintiff only cites to non-binding cases from outside the Eleventh Circuit to support her position that Defendant interfered by terminating her based on her FMLA absences.[7]
Here, the record shows that Plaintiff had exhausted her FMLA leave months before she requested additional leave in December 2015. Notably, Sedgwick sent Plaintiff a letter dated September 14, 2015, stating: "On September 4, 2015, an extension request packet was sent to you based on your request to extend your FMLA claim." (Meade Depo., Ex. 43, Doc. 60 at 605.) Plaintiff had clearly used up her allotted 12 weeks of FMLA leave at that point in time, thus necessitating her request for extended FMLA leave.[8] In her Response, Plaintiff's only argument that her FMLA leave was not exhausted is that Sedgwick extended her leave through March 25, 2016, after her termination. Yet as McGregor and Penaloza explain, the fact that Defendant granted Plaintiff additional unpaid leave - and even called it FMLA leave - cannot extend the statute's fixed entitlement of 12 weeks. Thus, Plaintiff cannot prevail on her FMLA interference claim under governing Eleventh Circuit law as she was not entitled to more FMLA leave when it was denied. Strickland , 239 F.3d at 1206-07. The Court *1280 therefore GRANTS summary judgment to Defendant on this claim.
C. FMLA Retaliation (Count 2)
Plaintiff also asserts an FMLA claim for retaliation. "When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, we apply the same burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green ... for evaluating Title VII discrimination claims." Strickland , 239 F.3d at 1207. "In order to state a claim of retaliation, an employee must allege that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity." Id. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision - here, the termination decision. If the defendant satisfies this burden, it shifts back to the plaintiff to show that the supposedly legitimate reason was in fact a pretext designed to mask unlawful discrimination. Jones , 854 F.3d at 1271.
Defendant makes two main arguments. First, Defendant contends that Plaintiff's December 2015 leave request was not statutorily protected activity, as Plaintiff had already exhausted her 12 weeks of FMLA leave by the time she made the request. Second, Defendant contends that it presented legitimate, nondiscriminatory reasons for Plaintiff's termination, and these reasons were not a pretext to cover up FMLA-based discrimination. In particular, Defendant states that it terminated Plaintiff's employment because "her performance was poor and because it believed Plaintiff was disingenuous about reporting her absences and about disclosing Professional Geek LLC." (Def.'s Motion, Doc. 58-1 at 18.)
Plaintiff again maintains that her FMLA leave was not exhausted, as she had been approved for intermittent FMLA leave through March 2016. She therefore asserts that she was engaging in statutorily protected activity by requesting FMLA leave around the time she was fired. She further argues that Ms. Clark, in particular, "intertwine[ed] Meade's use of FMLA and the decision to terminate Meade," which shows the two to be causally related. (Pl.'s Response, Doc. 72 at 19.) Plaintiff points out that Ms. Clark requested an investigation of Plaintiff's use of GM assets, while only selecting the FMLA leave dates for investigation. Based on these facts, Plaintiff claims she established her prima face case of retaliation. As for Defendant's legitimate, nondiscriminatory reasons, Plaintiff argues that Defendant provided inconsistent reasons for terminating her, thus establishing pretext. Specifically, Plaintiff points to the Georgia Department of Labor ("DOL") form submitted by Ms. Clark, where she only states the reason for discharge as the "[e]mployee could not perform the essential functions of the job." (Pl.'s Response, Doc. 72, Ex. 43.) Ms. Clark did not, Plaintiff argues, reference her outside business or that she was disingenuous in disclosing it. Additionally, Plaintiff argues pretext based on Ms. Clark's lack of credibility and Ms. Clark's recommendation to terminate Plaintiff based on her outside business, though Ms. Clark lacked evidence to support this and made the recommendation before completing the investigation into her business.
The Court first assesses whether Plaintiff has established a prima facie case of FMLA retaliation. The Court construes the "statutorily protected conduct" to be Plaintiff's request for and use of FMLA leave as a whole, not just her request for *1281 leave in December 2015. This is because Plaintiff's Response brief does not limit its retaliation argument to Plaintiff's December 2015 request. Rather, Plaintiff argues that "the record is clear that [she] had been using intermittent FMLA since July 2015" and that Ms. Clark "intertwin[ed] Meade's use of FMLA and the decision to terminate Meade." (Pl.'s Response, Doc. 72 at 19.) In this way, Plaintiff has likely satisfied the first element of her prima facie case. See Marks v. City of Atlanta, Georgia , No. 1:05-CV-0079-CAP-AJB, 2007 WL 9700632, at *28 (N.D. Ga. Jan. 10, 2007) (report and recommendation adopted) ("Plaintiff clearly states [ ] that the basis of his FMLA retaliation claim is his use of FMLA leave between October 2003 and January 6, 2004, not the denial of this second FMLA request or his absence following the denial of his second FMLA request. This decision to take FMLA leave between October 2003 and January 2004 is statutorily protected activity."). The Court assumes arguendo that Plaintiff has established the remaining prima facie elements as well.
Therefore, the Court turns to Defendant's legitimate, nondiscriminatory reasons for terminating Plaintiff. On summary judgment, Defendant argues three reasons: Plaintiff's poor performance, being disingenuous about reporting absences, and being disingenuous about her outside business. The Eleventh Circuit makes clear that, "[i]f the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." Crawford v. City of Fairburn, Ga. , 482 F.3d 1305, 1308 (11th Cir. 2007) (emphasis added).
The evidence is certainly troubling as to one of Defendant's reasons for termination: Plaintiff's alleged outside business. It seems that Defendant - Ms. Clark, in particular - was nearly impossible to satisfy when it came to Plaintiff showing she had not been disingenuous about her other business. For one, the parties dispute what exactly Ms. Clark asked Plaintiff to produce during the December 15, 2015 meeting to prove her business was not still operational. And after Plaintiff presented evidence to Ms. Clark (i.e., an internet search showing her business was not registered with the Georgia Secretary of State in 2015, a tax form showing no reported income in 2014, and a bank statement balance showing no activity in 2015), Defendant still proceeded to terminate her at least partly on this basis. In addition, Ms. Clark had previously passed on a "tip" to Mr. Myers in the Benefits division that Plaintiff had been running another business while on leave - a tip that was based on nothing more than flimsy evidence. Ms. Clark solely relied on Plaintiff's LinkedIn page and her prior conflict-of-interest form (which Defendant does not argue that Plaintiff improperly filled out at the time) in reaching that conclusion.[9]
However, while this evidence may create a jury question as to Defendant's proffered reason for terminating Plaintiff based on her outside business, it does not rebut or create a jury question regarding Defendant's other reason for termination - Plaintiff's poor performance/inability to do her job in light of her persistent absences.
*1282 As discussed above regarding Plaintiff's ADA claim, there is ample evidence supporting Defendant's position that Plaintiff could not fulfill the essential functions of her job because she was unable to be present sufficiently to complete her work duties. Plaintiff has not identified or produced concrete evidence showing otherwise or even calling this particular reason into doubt. Indeed, Plaintiff's Response brief focuses almost entirely on rebutting Defendant's reasons regarding Plaintiff's outside business and her FMLA reporting. Yet this evidence, while concerning, does not undercut Defendant's legitimate reason for firing Plaintiff based on her poor performance.[10] Consequently, Plaintiff has not created a jury question as to whether Defendant instead terminated her in retaliation for her use of FMLA leave.
The only evidence of possible pretext that Plaintiff presents relates to Ms. Clark's "strongly suspect" credibility. (Pl.'s Response, Doc. 72 at 22.) Plaintiff argues that a jury may reasonably infer that an employer is covering up its discriminatory purpose if the employer is shown to be dishonest. Plaintiff points to two pieces of evidence as support: (1) Ms. Clark claimed Ms. Castillo told her the "clean slate" only pertained to Plaintiff's improvement plan, though Ms. Castillo "denies discussing the 'clean slate' " with her; and (2) Ms. Clark told Ms. Georgell that Plaintiff was requesting "extensive" leave, but Ms. Georgell testified a 30-day leave request was not extensive. (Pl.'s Response, Doc. 72 at 23.) This evidence falls short of establishing pretext on the part of Defendant. For one, Ms. Castillo did not actually contradict Ms. Clark's testimony about the clean slate discussion as Plaintiff claims. Ms. Castillo merely testified that she did not recall this particular discussion. (Castillo Depo., Doc. 81 at 36.) Similarly, Ms. Georgell's testimony does not show Ms. Clark to be dishonest or undercut her credibility. Ms. Georgell testified that Ms. Clark told her that Plaintiff had, up to that point, been given "extensive leave." (Georgell Depo., Doc. 69-2 at 29-30.) Ms. Georgell also testified that she understood from Ms. Clark that Plaintiff was asking for "an extensive amount of time off" going forward, though Ms. Georgell later stated that she did not consider a request for 30 more days to be extensive. (Id. at 68.) This testimony shows that Ms. Georgell and Ms. Clark may have held differing opinions about what constitutes an "extensive" leave request. But it does not go so far as to show "strongly suspect" credibility on the part of Ms. Clark, and thereby create a jury question on pretext. In short, this evidence is too thin to support Plaintiff's position.
Plaintiff also argues that Defendant's inconsistent reasons for terminating her *1283 establish pretext. Plaintiff solely relies on the DOL separation form submitted and signed by Ms. Clark on January 21, 2016 for this argument. The DOL form, however, is not necessarily inconsistent with the other reasons Defendant gave for termination. In its Motion for Summary Judgment, Defendant provides three reasons for termination: poor performance, the belief that Plaintiff was disingenuous about reporting her absences, and the belief that Plaintiff was disingenuous about disclosing her outside business. The DOL form includes two of these three reasons: it states the reason for discharge as Plaintiff "could not perform the essential functions of the job," and it states the policy that Plaintiff failed to follow as the "[e]mployee failed to properly report FMLA absences in accordance with company policy." (Pl.'s Response, Doc. 70-24, Ex. 43.) While the DOL form does not include the third reason Defendant provides in its Motion - a reference to Plaintiff's outside business - this does not rise to the level of inconsistency suggesting that Defendant's performance/attendance justification was pretextual. It instead suggests there may have been an additional, undisclosed reason that GM management relied on in terminating Plaintiff. See Tidwell v. Carter Prod. , 135 F.3d 1422, 1428 (11th Cir. 1998) ("At most, the jury could find that performance was an additional, but undisclosed, reason for the decision; the existence of a possible additional non-discriminatory basis for Tidwell's termination does not, however, prove pretext."); see also Faircloth v. Herkel Investments Inc. , 514 F. App'x 848, 851 (11th Cir. 2013) ("[T]he fact that LaPerchia stated that Herkel fired him for economic reasons and later provided the EEOC with an additional reason for terminating him did not, by itself, establish pretext. While the identification of inconsistencies in an employer's testimony can be evidence of pretext, Herkel's reasons for terminating Faircloth were not necessarily inconsistent, because both the economy and his poor performance could have contributed towards his termination."); Trigo v. City of Doral , 663 F. App'x 871, 874 (11th Cir. 2016) ("[S]lightly differing reasons, or additional, undisclosed non-discriminatory reasons for the termination, are insufficient to show pretext."); c.f. Bechtel Const. Co. v. Sec'y of Labor , 50 F.3d 926, 935 (11th Cir. 1995) ("The pretextual nature of Bechtel's terminating Nichols is further demonstrated by Bechtel's shifting explanations for its actions. During the proceeding, the ALJ asked Bechtel whether Nichols' job performance or medical condition of arthritis were issues in the case. Bechtel indicated that they were not, attributing his dismissal rather to his attitude, his 'gung ho nature.' Yet, on appeal, petitioner's argument is cast entirely as if the layoff was due to poor job performance, exacerbated by Nichols' arthritic condition."). Alternatively, the DOL form suggests that Plaintiff's alleged outside business may not have been the actual reason for terminating her. But that alone does not debunk the performance/attendance evidence Defendant relied upon.
Furthermore, Defendant's three reasons asserted in its Motion for Summary Judgment are consistent with the reasons discussed during the December 16th and December 18th meetings with Plaintiff. On December 16th, Ms. Clark suspended Plaintiff and raised the issues of her performance, her outside business, and her failure to follow FMLA reporting procedures. Similarly, on December 18th, Ms. Clark told Plaintiff she was being terminated due to poor performance and her outside business. (Meade Depo., Doc. 60 at 510-520, Exs. 15-16.)
The current situation is distinguishable from *1284 Hurlbert v. St. Mary's Health Care System, Inc. , which Plaintiff cites as support for her position. 439 F.3d 1286 (11th Cir. 2006). There, the employer's documentation regarding the plaintiff's termination identified the "sole reason" for his termination as his inability to meet certain competency requirements. Id. at 1298. In moving for summary judgment, however, the employer asserted that the plaintiff was also fired for his "disciplinary status" and "unacceptable job performance." Id. One of the decision-makers also testified that he recommended the plaintiff be discharged for "borderline insubordinate behavior" when he walked out of an earlier meeting - another reason that appeared nowhere in the plaintiff's termination documentation. Id. In contrast, Defendant in the present case has not tacked on additional reasons for termination in its Motion that appear nowhere else in the termination discussions or papers concerning Plaintiff. Ms. Clark's notes for the December 16th and 18th meetings, in particular, align with all of Defendant's proffered reasons at summary judgment. The DOL form also aligns, just without including one of the reasons. The evidence simply does not show that Defendant provided "shifting explanations" for Plaintiff's termination so as to cover up its real, retaliatory reasons for termination.
As Plaintiff has not presented sufficient evidence to rebut Defendant's legitimate, nondiscriminatory reasons for terminating her, Plaintiff's FMLA retaliation claim cannot survive summary judgment. The Court GRANTS Defendant's Motion as to this claim.
D. COBRA/ERISA Violation (Count 3)
Plaintiff's one remaining claim pertains to Defendant's alleged violation of ERISA and COBRA, based on its failure to provide Plaintiff with timely notice of continuing health coverage after her termination. Defendant terminated Plaintiff's employment on December 16, 2015 due to "gross misconduct." Initially, Defendant notified her approximately two weeks after her termination that she was not qualified to receive continuing health coverage under COBRA. Yet on March 3, 2016, Defendant changed the coding of Plaintiff's termination so that it no longer reflected "gross misconduct," and Plaintiff received a COBRA notice in the mail around March 7, 2016.
COBRA requires the administrator of an employee-based health plan to notify a plan beneficiary (i.e., an individual employee) of their COBRA rights within 14 days of learning about a "qualifying event." 29 U.S.C. § 1166(4)(A), (c). Under COBRA, a "qualifying event" includes "[t]he termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment." 29 U.S.C. § 1163(2). Here, it is undisputed that Defendant is the administrator.
On summary judgment, Defendant argues that it did not violate COBRA by failing to send Plaintiff a COBRA notice within 14 days of her termination. Defendant maintains that "Plaintiff cannot establish that GM falsely categorized her termination as gross misconduct" at the outset, given that Defendant "believed she had been disingenuous about reporting her absences and about working for her personal business." (Def.'s Motion, Doc. 58-1 at 19.) Defendant also maintains that, once it changed the coding of Plaintiff's termination, it did not fail to timely notify her of her COBRA rights.[11]
*1285 Plaintiff responds that Defendant must establish that she was engaged in gross misconduct to code her termination accordingly. According to Plaintiff, Defendant has failed to show any evidence of gross misconduct on her part, and it has also failed to cite any legal authority supporting its decision to "unilaterally withdraw a decision on 'gross misconduct' without the consequences of violating COBRA." (Pl.'s Response, Doc. 72 at 24.) Plaintiff argues that, "by changing the withdrawing [of] the 'gross misconduct' code, then the December 18, 2015 termination date is the qualifying event, not some alleged conversation between counsel." (Id. at 25.) Plaintiff further argues that the evidence shows Defendant "intentionally miscoded" her termination as gross misconduct as a "bargaining chip" for future potential negotiations with Plaintiff. (Id. )
The Court is not aware of any binding authority interpreting the term "gross misconduct" under COBRA, and the parties have not cited to any. At most, in an unpublished decision, the Eleventh Circuit held that it agreed with the Seventh Circuit in interpreting gross misconduct to "involve something more than incompetence or unsatisfactory performance." Virciglio v. Work Train Staffing LLC , 674 F. App'x 879, 891 (11th Cir. 2016) (citing to Mlsna v. Unitel Commc'ns, Inc. , 91 F.3d 876, 881 (7th Cir. 1996) ).
In the absence of binding authority, the Court finds the Seventh Circuit's reasoning in Kariotis v. Navistar Int'l Transp. Corp. to be persuasive. 131 F.3d 672, 680 (7th Cir. 1997). The Seventh Circuit held that "the employer's belief that the employee engaged in gross misconduct must be more than its honest, actual belief-the record must demonstrate that the employee did indeed engage in gross misconduct." Id. At a minimum, even if the Court were to modify the Seventh Circuit's standard, the employer must have an "honest, actual belief" that the employee engaged in gross misconduct for COBRA purposes.
Giddens v. Univ. Yacht Club, Inc. , a decision by another judge in this same district, is also instructive. No. 2:05-CV-19-WC, 2006 WL 508056, at *3 (N.D. Ga. Mar. 1, 2006). There, Judge William C. O'Kelley noted, "Generally, courts have concluded that gross misconduct must involve more than ordinary negligence or incompetence and requires conduct that is intentional, wanton, willful, deliberate, reckless, or in deliberate indifference to an employer's interest.... An employee's deliberate violation or disregard of his or her employer's standards of behavior, particularly if repeated, may also constitute gross misconduct." Id. With these principles in mind, the court turned to the alleged gross misconduct of the plaintiff: "Mr. Giddens was derelict in his management of defendant's finances," "he used defendant's property to satisfy a personal debt," and "he repeatedly used the corporate credit card to make personal purchases." Id. However, the plaintiffs (Mr. Gidden and his wife) denied these actions and claimed that Mr. Giddens's termination was due to other reasons - a personal conflict. The court thereby concluded that "the true reason for Mr. Giddens' termination remains in dispute," and that "a disputed question of material fact remains as to whether Mr. Giddens was terminated for gross misconduct." Id.
As in Giddens , there is a factual dispute about whether Defendant actually terminated *1286 Plaintiff for gross misconduct. In particular, Ms. Clark's email to Ms. Georgell on February 15, 2016, which describes the gross misconduct coding as a "bargaining chip," raises questions about Defendant's "honest, actual belief" that Plaintiff engaged in gross misconduct. For instance, a jury could infer that Defendant falsely coded Plaintiff's termination as gross misconduct from the start, in anticipation of Plaintiff filing a lawsuit, so that Defendant could use the coding as a "bargaining chip" in negotiating with her.
Additionally, there is a factual dispute about whether Plaintiff actually engaged in the gross misconduct that Defendant claims she did. Plaintiff denies that she was continuing to operate her outside business in 2015. She also denies that she improperly reported her FMLA leave, claiming that Sedgwick did not inform her of the "3:30 P.M. reporting requirement" until late in November 2015. Thus, the record shows that Defendant "could have been mistaken" about Plaintiff's suspected conduct instead of "proving" that she engaged in such conduct. Kariotis , 131 F.3d at 680.
The Court concludes that Plaintiff has presented enough evidence to create factual disputes about the gross misconduct coding. Accordingly, the Court cannot determine at this time, as a matter of law, whether Defendant did or did not violate COBRA's notice requirement. And if Plaintiff ultimately prevails on this claim, she may be entitled to statutory penalties under 29 U.S.C. § 1132(c)(1) for the time period in which Defendant failed to provide her COBRA notice as required by law.[12]
IV. Conclusion
For the reasons discussed above, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment [Doc. 58]. Counts 1, 2, and 4 are dismissed. Count 3 survives summary judgment.
In light of the fact that Plaintiff's only remaining claim is Count 3 (the COBRA/ERISA violation), the Court DIRECTS the parties to confer about possible settlement promptly. The Court FURTHER ORDERS the parties to participate in mediation to explore possible resolution of this case, if the case has not already settled. The mediation shall conclude no later than August 10, 2018. The Court REFERS this case to the next available Magistrate Judge for mediation and ADMINISTRATIVELY CLOSES[13] this case pending the conclusion of mediation.
In the event the mediation is successful, the parties are DIRECTED to notify the Court by August 15, 2018 and to file the necessary dismissal documents by August 29, 2018.
In the event the mediation is unsuccessful, the parties are DIRECTED to notify the Court and file a motion to re-open the case by August 15, 2018. The Clerk is *1287 DIRECTED to re-open the case upon receipt of the parties' motion. Additionally, the parties shall file a proposed consolidated pretrial order by August 29, 2018.
IT IS SO ORDERED this 28th day of June, 2018.

The factual summary here does not constitute actual findings of fact. The Court derives the facts below from the evidence in the record and provides this factual summary solely for background purposes.

Plaintiff objects that Ms. Clark's notations based on her phone calls with Sedgwick representatives are inadmissible as hearsay and not the best evidence. The Court does not determine whether or not Ms. Clark's notations are admissible at this juncture and does not consider these notations independently in its analysis. However, the Court may still consider Ms. Clark's testimony that she conducted an investigation into Ms. Meade's absences and that she concluded Ms. Meade had accumulated 16.5 days of unapproved absences. (Clark Depo., Doc. 82-2 at 147.)

"S & A" stands for Sickness and Accident benefits, which is GM's short-term paid disability leave program. (See Meade Depo., Doc. 60 at 165.)

COBRA (set forth in 29 U.S.C. § 1161 et seq. ) amended ERISA so that, upon an employee's termination (other than for gross misconduct reasons), the employee has the option of receiving continued healthcare coverage under the group health plan.

The parties' briefs are organized in a somewhat confusing manner regarding Plaintiff's two ADA claims - discrimination based on termination and discrimination based on denial of a reasonable accommodation - both of which fall under Count 4 in the Third Amended Complaint. The Court attempts to provide some clarity here.
Plaintiff's Response only addresses the "qualified individual" inquiry in the section titled "ADA - Discrimination," but not in the next section titled "ADA - Reasonable Accommodation." For clarity purposes, the Court notes that an ADA discrimination claim and an ADA reasonable accommodation claim both require Plaintiff to establish a prima facie case, which includes the "qualified individual" prong. See Holly v. Clairson Indus., L.L.C. , 492 F.3d 1247, 1256 (11th Cir. 2007) ; Williams v. Motorola, Inc. , 303 F.3d 1284, 1291 (11th Cir. 2002). Thus, the Court's analysis of whether Plaintiff is a "qualified individual" applies to both of Plaintiff's ADA claims.
Additionally, the Court notes that both parties' briefs discuss whether Plaintiff's request for leave in December 2015 was a reasonable one apart from the "qualified individual" analysis. But these two analyses are inextricably linked. In determining if Plaintiff is qualified, the Court must assess whether Plaintiff "can perform the essential functions of his job without accommodation , or, failing that, ... that he can perform the essential functions of his job with a reasonable accommodation. " Holly , 492 F.3d at 1256 (emphasis added); see also Jackson , 22 F.3d at 279 (examining Plaintiff's reasonable accommodation request as part of the "qualified individual" analysis). The Court therefore addresses some of the parties' arguments regarding reasonable accommodation in determining whether Plaintiff was a qualified employee when she was terminated.

Plaintiff's effort to distinguish Robinson is not persuasive. 2008 WL 78711. The fact that the plaintiff's absences in Robinson were unexcused or that she had accrued several written warnings before her termination does not, on its own, meaningfully affect the inquiry into whether there was evidence she could actually perform her job.

The Court notes that the Eighth Circuit's and the Ninth Circuit's decisions are in conflict on this point. Compare Lovland v. Employers Mut. Cas. Co. , 674 F.3d 806, 811 (8th Cir. 2012) ("[W]hen the employee asserts a § 2615(a)(1) [interference] claim that a right prescribed by the FMLA has been denied, we have held that the employer's intent in denying the benefit is immaterial."), with Bachelder v. Am. W. Airlines, Inc. , 259 F.3d 1112, 1125 (9th Cir. 2001) ("[T]he FMLA [interference claim] is implicated and does protect an employee against disciplinary action based on her absences if those absences are taken for one of the Act's enumerated reasons.").

The Court notes that the evidence, at first blush, appears disputed as to whether Plaintiff's short-term disability leave for 72 days in early 2015 also counted as FMLA leave. If these 72 days were excluded from the calculation, Plaintiff would only have used 46 days for FMLA leave in 2015. (Johnston Depo., Doc. 63-2, Ex. 22.) This is less than the 60 work days provided by FMLA.
Defendant maintains that Plaintiff had used up her 60 days of FMLA leave by the time she asked for additional leave in December 2015. Defendant presents at least three pieces of evidence to support this assertion: (1) Mr. Johnston's spreadsheet summarizing Plaintiff's absences in 2015; (2) Plaintiff's deposition testimony that she believed her 72 days of short-term disability leave counted towards her FMLA leave (Meade Depo., Doc. 60 at 184-85); and (3) the Sedgwick letter in September 2015 to Plaintiff regarding her request to "extend" her FMLA leave (Meade Depo., Doc. 60 at 605, Ex. 43). Plaintiff does not present concrete evidence to show otherwise. At most, she points to other parts of her deposition testimony and her declaration that are inconclusive about whether she understood her short-term disability counted towards her FMLA leave. (Meade Depo., Doc. 60 at 210; Meade Declaration, Doc. 70-2 ¶ 3.) This is not sufficient to create a genuine dispute of material fact for the jury as to Plaintiff's exhaustion of her FMLA leave as of December 2015.

Plaintiff has also presented evidence that may create a jury question as to Defendant's proffered reason for terminating Plaintiff based on her disingenuous or improper reporting of FMLA leave. In particular, Plaintiff stated in her declaration that she had been reporting her FMLA leave for each day as she had been instructed to do in July 2015, and that she only first learned of Sedgwick's "3:30pm reporting requirement" on November 24, 2015. (Meade Declaration, Doc. 70-2 ¶ 8.)

The Court notes that there may be circumstances in which "the multiple grounds offered by the defendant for the adverse action of which the plaintiff complains are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment." Russell v. Acme-Evans Co. , 51 F.3d 64, 70 (7th Cir. 1995) (in the context of an ADA discrimination claim). In other words, "a multitude of suspicious explanations may itself suggest that the employer's investigatory process was so questionable" that it is pretextual. Smith v. Chrysler Corp. , 155 F.3d 799, 809 (6th Cir. 1998). However, these circumstances are not before the Court in this matter, as the Court finds that Defendant's reasons do not rise to such a level of suspicion based on the current record. See Chapman v. AI Transp. , 229 F.3d 1012, 1049-50 (11th Cir. 2000) (in concurring opinion, the panel judges stated, "While the general rule requiring an employment discrimination plaintiff to demonstrate pretext as to each and every legitimate, nondiscriminatory reason offered by the employer is reasonable in the majority of cases, that general rule fails when applied to a small percentage of cases ," where there is a "multitude of suspicious explanations.") (emphasis added).

Defendant also maintains that its termination date should not be deemed the qualifying event for purposes of providing the COBRA notice to Plaintiff. Rather, it contends that March 3, 2016 is the qualifying event. Defendant's contention, if true, could gut COBRA's notice provision of its protective shield and sword. The Court concludes this contention is simply wrong.

The Court previously directed the parties to brief the issue of whether Plaintiff had standing to bring her COBRA/ERISA claim, given that she had been able to obtain other healthcare coverage by the time she was notified of her COBRA rights. The Court was concerned about the injury-in-fact element of standing. (Doc. 78.) Upon review of the parties' briefs, however, the Court finds that the case law is clear that a plaintiff need not prove prejudice or damages to bring a claim for statutory penalties under 29 U.S.C. § 1132(c)(1). See Scott v. Suncoast Bev. Sales, Ltd. , 295 F.3d 1223 (11th Cir. 2002).

Administrative closure of a case does not prejudice the rights of the parties to litigation in any manner. The parties may move to re-open an administratively closed case at any time.